FILED
2012 OCT 11 P 3:44
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

WINSTON & STRAWN LLP
W. Gordon Dobie (moving for admission *pro hac vice*)
wdobie@winston.com
William C. O'Neil (moving for admission *pro hac vice*)
woneil@winston.com
Kathryn A. Wendel (moving for admission *pro hac vice*)
kwendel@winston.com
35 West Wacker Drive
Chicago, IL 60601
Telephone: 312-558-5600
Facsimile: 312-558-5700

WINSTON & STRAWN LLP
Robert B. Pringle (SBN: 51365)
rpringle@winston.com
Eric E. Sagerman (SBN: 155496)
esagerman@winston.com
101 California Street
San Francisco, CA 94111-5802
Telephone: 415-591-1000
Facsimile: 415-591-1400

Attorneys for Plaintiff
SOLYNDRA LLC

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**OAKLAND DIVISION**

| | |
|---|---|
| SOLYNDRA LLC,<br>Plaintiff,<br>vs.<br>SUNTECH POWER HOLDINGS CO., LTD., SUNTECH AMERICA, INC., TRINA SOLAR LIMITED, TRINA SOLAR (U.S.), INC., YINGLI GREEN ENERGY HOLDING COMPANY LIMITED, YINGLI GREEN ENERGY AMERICAS, INC.,<br>Defendants. | Case No. C 12 5272 JSC<br><br>**COMPLAINT FOR VIOLATIONS OF §§ 1 & 2 OF THE SHERMAN ANTITRUST ACT, THE CALIFORNIA UNFAIR PRACTICES ACT, THE CARTWRIGHT ACT, AND FOR TORTIOUS INTERFERENCE**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Solyndra LLC ("Solyndra") for its complaint against Defendants Suntech Power Holdings Co., Ltd., Suntech America, Inc. (collectively, "Suntech"), Trina Solar Limited, Trina Solar (U.S.), Inc., (collectively, "Trina"), Yingli Green Energy Holding Company Limited, and Yingli Green Energy Americas Inc. (collectively, "Yingli"). Suntech, Trina, and Yingli shall hereinafter collectively be referred to at times as "Defendants," and Solyndra alleges as follows:

**SUMMARY OF THE ACTION**

1. This is an action for attempted monopolization, conspiracy, predatory pricing, tortious interference, and price fixing that seeks redress for the anticompetitive acts of an illegal cartel of Chinese solar panel manufacturers who conspired to, and succeeded in, destroying Solyndra, a company that was once named one of the "50 Most Innovative Companies in the World" by the Massachusetts Institute of Technology.

2. Defendants initially came to the United States to raise money from American investors by selling American Depositary Shares ("ADS") on the New York Stock Exchange. Incredibly, Defendants elected to deploy the capital they raised from Americans to destroy American solar manufacturers, like Solyndra. To achieve this goal, Defendants employed a complex scheme, in collaboration with each other and raw material suppliers and certain lenders, to flood the United States solar market with solar panels at below-cost prices.

3. What is more, Defendants' plan to dominate the United States solar market was coordinated by Defendants, trade associations, certain government-related commercial entities, such that Defendants conspired to export more than 95% of their production and dump their products in the United States and achieve market domination. In fact, Suntech's then-CEO even admitted to the illegal conduct at issue, noting, "Suntech, to build market share, is selling solar panels on the American market for less than the cost of materials, assembly, and shipping."

4. Further to their dumping conspiracy, the three Defendants' prices moved in tandem—falling 75% in four years as their massive imports hit the United States market. Consistent with their conspiracy, two Defendants share an address (Yingli and Trina), and the two senior-most executives of Trina and Suntech work together on the board of a Chinese trade association with the stated purpose of "collaboration."

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

5. Unfortunately for Solyndra and American consumers, Defendants' plan worked—Defendants' actions destroyed not only Solyndra, but nearly a dozen other United States solar manufacturers, who have all sought bankruptcy protection.

6. Defendants' actions, however, have not gone unnoticed by the United States Government. The Department of Commerce ("Commerce") has already determined that Defendants "dumped" solar panels in the United States market at "less than fair value" such that it was necessary to issue massive duties of as much as 31.73% in an attempt to even the playing field for the few remaining American solar manufacturers that have not already been driven out of business. Similarly, the International Trade Commission ("ITC") determined that the United States solar panel manufacturers' financial condition "worsened throughout the period of investigation as the volume and market share of subject imports grew, even though the industry was experiencing rapidly increasing demand."

7. Of course, the United States governmental determinations are of little comfort to Solyndra, whose only hope of redress is through this action. By this complaint, Solyndra seeks compensation for the loss of the $1.5 billion value of its business and more which Defendants destroyed.

**JURISDICTION AND VENUE**

8. This Court has jurisdiction over this action under 15 U.S.C. § 15 and 28 U.S.C. §§ 1331 and 1337. This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367 because those claims are so related to the federal claims that they form part of the same case or controversy. In addition, this Court has jurisdiction over the state law claims pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000 and there is diversity of citizenship among the parties.

9. Venue is appropriate in this District under 15 U.S.C. §§ 15 and 22 and 28 U.S.C. § 1391(b), (c), and (d) because Defendants reside or transact business in this District, and because a substantial portion of the affected interstate commerce described herein was carried out in this District.

10. The conduct of Defendants and their co-conspirators described in this complaint was

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

within the flow of, was intended to, and did have a substantial effect on the foreign and interstate commerce of the United States. Defendants' conduct, and that of their co-conspirators, further substantially affected commerce in California, and accordingly, Defendants have purposefully availed themselves of California's laws.

**INTRADISTRICT ASSIGNMENT**

11. Pursuant to Northern District of California Local Rule 3-2, this action should be assigned to the Oakland Division. Plaintiff Solyndra LLC has its headquarters in Alameda County and suffered injuries in Alameda County as a result of Defendants' actions.

**PARTIES**

12. Solyndra LLC was a manufacturer of solar panels based in Fremont, California. Solyndra manufactured, shipped, managed its business, and suffered the injury described in this complaint in California.

13. Solyndra's solar panels, featuring cylindrical tubes deposited with a thin film photovoltaic material, was targeted for commercial and industrial rooftop applications. Solyndra's solar panels were designed to deliver the highest energy production per rooftop on a kilowatt hour basis. Solyndra shipped its first commercial solar panels in July 2008 and increased both sales volume and revenue every quarter through March 2010. More than $300 million of Solyndra's panels have been sold internationally and across the United States. Solyndra's solar panels enhance sunlight collection by capturing direct, diffuse, and reflected sunlight across a 360-degree photovoltaic surface. The cylindrical shape of Solyndra's modules allows them to achieve effective energy generation when mounted horizontally. The horizontal mounting of Solyndra's panels also allows Solyndra's panels to be positioned significantly closer together than conventional panels, which require tilting and spacing, on a typical rooftop. This enables greater rooftop coverage and enhanced energy production. In August 2011, Solyndra had approximately 1,100 employees in the United States and Europe. As a result of the conduct detailed below, on September 6, 2011, Solyndra was forced to file for Chapter 11 bankruptcy protection. Solyndra LLC is the assignee and successor to all claims of Solyndra Inc. pursuant to the terms of the Asset Transfer Agreement dated February 23, 2011 and by operation of law.

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

14. Suntech Power Holdings Co., Ltd. ("Suntech Power") is the world's largest producer of solar panels and a New York Stock Exchange listed company. While a significant amount of its operations are in China, interestingly Suntech Power is a Cayman Islands corporation. It is managed from its headquarters in Wuxi, Jiangsu Province, China, and makes decisions concerning pricing of its products in the United States and output. As of December 31, 2011, Suntech Power had assets of $4.5 billion, more than $3 billion in revenues, over 17,500 employees, and delivered its products to over 80 countries across the world. Due to the illegal and anticompetitive actions alleged herein, its sales in the United States have gone from a negligible amount in 2005 to almost $750 million in 2011. On December 14, 2005, Suntech Power listed its ADS on the New York Stock Exchange under the symbol "STP." Suntech completed an initial public offering of 30 million ADS on December 19, 2005 and an additional public offering of 23 million ADS on May 28, 2009, raising three-quarters of a billion dollars. In addition, Suntech Power[1] requested to be a voluntary respondent in proceedings before the ITC and Commerce in Washington, D.C. As discussed below, in these proceedings, the United States government found that Suntech dumped its solar panels in the United States and materially injured United States manufacturers like Solyndra.

15. Suntech America, Inc. ("Suntech America") is a 100% wholly owned subsidiary of Suntech Power. Suntech America is incorporated in Delaware and based in San Francisco, California. Its officers overlap with Suntech Power, its financial statements are consolidated as reported to the SEC, and Suntech Power and Suntech America work together to sell and dump Chinese-manufactured solar panels in the United States market. For example, Andrew Beebe serves as Chief Commercial Officer for Suntech Power and the head of global sales and marketing operations for Suntech America. Suntech America's Chief Financial Officer, Anlin Ting-Masonn holds that same position with Suntech Power. Suntech America acts for and is the alter ego of Suntech Power in the United States and with the understanding that the Chinese-based entity is ultimately in control.

[1] For some years, the company operated as Wuxi Suntech Power Co., Ltd. However, in connection with its incorporation in the Cayman Islands and sale of stock to the American public, Wuxi Suntech was made a subsidiary of the holding company Suntech Power Holding Co., Ltd., and is an alter ego thereof. Suntech Power and its subsidiaries are hereinafter referred to collectively as "Suntech."

16. Trina Solar Limited ("Trina Limited") is a leading manufacturer of photovoltaic solar panels. Trina Limited is a New York Stock Exchange listed company, incorporated in the Cayman Islands. It is managed from its executive offices in Changzhou, Jiangsu Province, China, and makes decisions concerning pricing of its products in the United States and output. As of December 31, 2011, Trina Limited had $2.8 billion in assets, more than $2 billion in revenues, and over 14,000 employees. It has offices in Europe, North America, South America and Asia. As a result of Trina Limited's aggressive and illegal approach to increasing sales in the United States, sales in the United States increased from $13 million in 2009 to $440 million in 2011, and its market share has climbed steadily through 2012. On December 19, 2006, Trina Limited listed its ADS on the New York Stock Exchange under the symbol "TSL." Trina Limited completed its initial public offering of 5.3 million ADS on December 22, 2006, and follow-on offerings in July 2009 and March 2010. Trina Limited wholly owns eight subsidiaries that it chose to incorporate in the United States. Trina Limited[2] also requested to be a voluntary respondent in proceedings before the ITC and Commerce in Washington, D.C. Like Suntech, the United States government has also found Trina guilty of dumping its solar panels in the United States.

17. Trina Solar (U.S.), Inc. ("Trina U.S.") is a 100% wholly owned subsidiary of Trina Limited, and has its principal place of business in San Jose, California. Its officers overlap with Trina Limited, its financial statements are consolidated as reported to the SEC, and Trina Limited and Trina U.S. work together to sell and dump Chinese-manufactured solar panels in the United States market. For example, Jifan Gao, the CEO of Trina Limited, also functions as the CEO of Trina U.S. Trina U.S. acts for and is the alter ego of Trina Solar in the United States and with the understanding that the Chinese-based entity is ultimately in control.

18. Yingli Green Energy Holding Company ("Yingli Solar") is a leading solar energy company and one of the largest vertically integrated manufacturers of photovoltaic solar panels. Yingli Solar is a New York Stock Exchange listed company, and is incorporated in the Cayman

2 For some years, the company operated as Changzhou Trina Solar Energy Co., Ltd. However, in connection with its incorporation in the Cayman Islands and sale of stock to the American public, Changzhou Trina was made a subsidiary of the holding company Trina Limited, and is an alter ego thereof. Trina Limited and its subsidiaries are hereinafter referred to collectively as "Trina."



Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

Islands. It is managed from its executive offices in Baoding, Hebei Province, China, and makes decisions concerning pricing of its products in the United States and output. As of December 31, 2011, Yingli Solar had $2 billion in assets, more than $2.3 billion in revenues, and over 16,000 employees. It has offices in North America, Europe, Asia, and Australia. Like its co-conspirator Defendants, and because of the conspiracy, Yingli Solar's sales increased from an almost negligible amount to $340 million in 2011. Yingli's market share has increased exponentially in light of the bankruptcy of almost a dozen American solar manufacturers as the result of Defendants' anticompetitive conduct. On June 8, 2007, Yingli Solar listed its ADS on the New York Stock Exchange under "YGE," and on June 13, 2007, Yingli Solar completed its initial public offering of approximately 26.5 million ADS. Yingli Green Energy Holding Company sells products under the brand name Yingli Solar. Yingli Solar markets itself in the United States, through partnerships with U.S. Soccer and American football, among over avenues. In addition, Yingli Solar also requested to be a voluntary respondent in proceedings before the ITC and Commerce in Washington, D.C., and has also been found guilty of dumping its solar panels in the United States.

19. Yingli Green Energy Americas, Inc. ("Yingli Americas") is a wholly-owned subsidiary of Yingli International and is a Delaware limited liability company. Yingli Americas has its principal place of business in San Francisco, California and is headquartered both in San Francisco and New York City, New York. Yingli Americas' executives overlap with Yingli Solar, its financial statements are consolidated as reported to the SEC, and Yingli Solar and Yingli Americas work together to sell and dump Chinese-manufactured solar panels in the United States market. Yingli Americas acts for and is the alter ego of Yingli Solar in the United States and with the understanding that the Chinese-based entity is ultimately in control.

**CO-CONSPIRATORS**

20. At all relevant times, various other persons, firms, and corporations, named and unnamed, have participated as co-conspirators with Defendants and have performed acts in furtherance of the conspiracy.

21. Co-conspirator China New Energy Chamber of Commerce ("China New Energy"), established in 2006, is one of the leading trade associations in China for solar and other alternative

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

energy sources. The Chairman of Trina Solar and Suntech Power's Chairman and CEO both serve on the board of China New Energy and Yingli is also an active member. China New Energy provided significant assistance and participated in the conspiracy. Through China New Energy, Defendants hold regular meetings, share market and industry information, "collaborate," coordinate efforts with the government, and more recently, seek to combat claims of dumping on behalf of its members.

22. China's National Energy Administration is and has been involved in issuing various commercial directives for the Chinese solar industry. For example, its Five-Year Plan for the Solar Photovoltaic Industry (the "Five-Year Plan") sets forth the goals for solar photovoltaic ("PV") production, domestic energy consumption, and export. Importantly, the Five-Year Plan calls for the promotion and expansion of China's top PV manufacturers, such as Defendants. Focus on this industry is not surprising given that Chinese companies exported $20.2 billion worth of solar products in 2010 alone. Indeed, rather than using the products manufactured in China to meet China's unquenched energy needs and environmental targets, Defendants instead, as part of this plan, exported their solar products (the "Export Plan"). In fact, each of the Defendants exported and dumped more than 95% of their products.

23. As part of the conspiracy to monopolize the solar market and as part of the Export Plan, the China Development Bank, the Bank of China, and the Export-Import Bank of China loaned Defendants over $17 billion at below-market rates, as described more fully below. These loans are used by Defendants who then export 95% of their product and dump below-cost solar panels on the United States market. Defendant Suntech has admitted that its $7.3 billion below-market credit line is used to expand capacity—all as part of Defendants' goal of gaining market share at the expense of American companies. China Development Bank, Bank of China, and the Export-Import Bank of China participated in Defendants' conspiracy and supported them in their actions. Further, through an "extend and pretend" scheme the loans are frequently rolled over with payment delayed indefinitely. Such loans have been cited by Commerce as part of the illegal subsidies provided to Defendants. As noted by the Chief Marketing Officer of another leading American solar manufacturer: "The Chinese strategy is very clear. They are engaging in predatory financing, and

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

they're trying to drive everybody else out of the market. When you've got free money[,] you can out-dump everybody below cost."

24. Defendants are further assisted in their conspiracy by Chinese polysilicon manufacturers, such as GCL-Poly Energy Holdings Limited, Jiangsu Shunda, and Daqo New Energy Corp. Polysilicon is an essential raw material for the production of Defendants' solar panels. Through Defendants' agreement with its co-conspirators, they are able to obtain polysilicon at prices unavailable to Solyndra and other American manufacturers. Following extensive litigation with Defendants, Commerce has already cited Defendants' agreements with polysilicon manufacturers as part of the illegal conspiracy described herein. Further, as described more fully below, Defendants used these polysilicon manufacturers to conceal their true costs of production and as part of the plan by Defendants and their co-conspirators to export more than 95% of their product and to monopolize the market.

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

## THE RELEVANT PRODUCT & GEOGRAPHIC MARKETS

25. The relevant market for purposes of this action is the market for the sale of photovoltaic solar panels used in commercial and industrial rooftop installations (typically 1MW – 5MW) in the United States.

26. Commercial and industrial rooftops are an immense and underutilized resource for generating renewable solar electricity. To take advantage of this underutilized resource, Solyndra created a photovoltaic system that featured proprietary cylindrical panels. This system differed from the traditional flat solar panels manufactured and sold by Solyndra's competitors. Solyndra's tube design had three primary competitive advantages over its flat-panel competition—(1) it collected a full 360 degrees of light, including light refracted off of the rooftop, (2) its system weight was far lighter and could be installed on low-load bearing rooftops, and (3) it had a lower system installation cost on a per watt basis.

27. Commercial and industrial rooftop systems, such as those offered by Solyndra and Defendants, are installed where power is consumed, thereby avoiding the burdensome costs of maintaining a centralized electricity generation system and attendant distribution infrastructure costs.

///

28. Solyndra's panels have been utilized in hundreds of commercial and industrial installations across the United States. Solyndra primarily sold its systems to value-added resellers, including system integrators and roofing materials manufacturers, which then resold them to various system owners, including third-party investors, manufacturers, wholesaler-distributors, big-box retailers, government entities, and utility companies.

29. The total commercial and industrial rooftop area viable for installation is an estimated 30 billion square feet in the United States, representing a potential market of approximately 200,000 megawatts of power. This represents more than $200 billion of financial opportunity for rooftop solar manufacturers, almost all of which is untapped.

30. As a real world illustration, the expected production capacity of Solyndra's completed Fab 2 plant (Phase I and Phase II) would be 441 MW of panels per year. Just one year of output from Solyndra's plant would have been sufficient to provide all the power needs for more than 46,000 homes. Over the life span of Solyndra's facility, it would have been capable of producing solar panels that, over the course of their expected useful life, could have produced 506 billion kilowatt-hours of electricity, enough to power every household in Oakland (158,000 households) for 126 years.

31. Specific to the commercial and industrial rooftop solar market, several important factors influence what type of photovoltaic system customers choose to purchase, such as the energy return that a given system yields. Building owners also typically seek to limit rooftop impact in order to comply with a rooftop system's warranty requirements.

32. Polysilicon-based solar panels, such as those produced by Defendants, and thin film panels, such as those produced by Solyndra, compete against each other in the commercial and industrial rooftop marketplace. Before Defendants destroyed Solyndra, the parties were competitors in the commercial and industrial rooftop photovoltaic marketplace. Both Defendants' polysilicon solar panels and Solyndra's thin film solar panels are used in solar power-generation systems that are mounted on commercial and industrial rooftops and convert sunlight into electricity.

///

///

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

33. The relevant geographic market is the United States. Defendants operate in this marketing area. Defendants treat the United States as a single and distinct geographic market. The ITC and Commerce (in actions in which Defendants are respondents) similarly have confirmed that the United States is a relevant market. Likewise, Shi Zhengrong, the chief executive and founder of Defendant Suntech Power, admitted that the United States is one common market.

34. Defendants also operate assembly and distribution plants and other operations in the United States to facilitate their supply of commercial and industrial rooftop solar panels to the United States market.

35. The relevant product market consists of the market for the sales or marketing of commercial and industrial rooftop solar photovoltaic panels to commercial and industrial rooftop solar photovoltaic panel production plants (*i.e.*, sell-side), and the market for the purchase of commercial and industrial rooftop solar photovoltaic panels (*i.e.*, buy-side).

36. Commercial and industrial rooftops require solar energy-producing systems with distinct structure and spacial specifications, thereby making it impractical for non-commercial rooftop market participants to purchase commercial and industrial rooftop solar systems. Commercial and industrial rooftop photovoltaic systems are typically large installations (from 250KW to 5MW or more) that require high efficiency (given space constrained rooftops), low weight, ease of installation, non-invasive mounting, and ease of maintenance. That the market for commercial and industrial rooftop solar photovoltaic panels is a distinct market is confirmed by the fact that it is treated as such by leading industry analysts.

37. Further, there are substantial barriers to entry into the production of commercial and industrial rooftop solar systems. The cost alone for acquiring the necessary land and commodities, and constructing the required plant facility is prohibitive. For example, Solyndra's Fab 2 plant cost over $720 million to build. To enter into this business, one must also hire hundreds of highly educated employees[3] and invest tens of millions of dollars in research and development in order to obtain scalability. Solyndra's technology, protected by its intellectual property, posed a real and

[3] For example, virtually all of Defendants' chief executives hold advanced degrees in science or business.





Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

substantial threat to Defendants in the commercial and industrial rooftop market. Solyndra's better solar panel system, with its lower cost of installation, created a barrier to Defendants' complete domination of the market—so long as Solyndra, and its technology, was available in the market, Defendants would not have been able to dominate the commercial and industrial rooftop market.

38. The barriers to entry are further highlighted by the fact that technology in the commercial and industrial rooftop solar photovoltaic market is constantly evolving. If a competitor's system or process fails to perform, that competitor will almost certainly fail to generate sufficient revenue to support operations.

39. Similarly, to compete in the commercial and industrial rooftop market, a competitor must have a knowledgeable and effective sales force, a workforce with a mastery of the technical aspects of the business, a strong intellectual property portfolio, and the regulatory knowledge to understand and help customers maximize renewable energy subsidies and incentives.

40. Defendants occupy a dominant position in the United States commercial and industrial rooftop solar market enabling them to exercise their market power as oligopolists. In 2011—before Defendants drove a host of United States solar manufacturers out of business and further increased their market share—Defendants collectively controlled 52% of the entire United States solar market. Individually, Suntech, Trina and Yingli controlled at least 20%, 17%, and 15% respectively of that market in 2011. Critically, in the commercial and industrial rooftop market—where First Solar with its 20% overall industry market share does not even compete—Defendants' market power is even greater, at well over 65%, as both Solyndra and Energy Conversion Devices, Inc. (a United States manufacturer also predominately targeting rooftop system installations) were forced into bankruptcy, with Suntech, Trina, and Yingli controlling at least 25%, 21%, and 19% respectively of the commercial and industrial rooftop market. In 2012, Defendants' market share has only increased as the conspiracy continued and additional American companies failed.

///

///

///

///

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

## FACTUAL ALLEGATIONS

### Solar Energy Industry

**A. Background of Solar Technology**

41. Facing a worldwide energy crisis, America has collectively looked for ways to manage consumption of fossil fuels, such as oil, coal, and gas, and to simultaneously conserve the world's natural resources through sustainable and renewable energy solutions. Foremost among these solutions is harnessing the sun's energy through solar power.

42. Solar power is generally defined as the conversion of sunlight into electricity using either PV or indirectly through concentrated solar power ("CSP").[4] PV solar power utilizes the photovoltaic effect in which photons of light excite electrons into a higher state of energy, causing them to act as carriers for an electric current. With PV technology, the energy of light is converted directly into electricity. CSP uses lenses and mirrors to concentrate dispersed sunlight into a beam of light that can produce heat to turn a turbine and thus generate electricity.

43. Historically and through to the present, PV is a much more common method of producing solar energy than CSP. Common PV materials include monocrystalline silicon, polycrystalline silicon (also called polysilicon), amorphous silicon, copper indium gallium diselenide ("CIGS"), and cadium telluride.

44. One of these PV materials will be contained in a solar cell, the building block of a PV solar energy system. Multiple solar cells make up a solar panel.[5] Multiple solar panels, in turn, make up an array. A single solar panel may be sufficient to power a small device, such as a telephone, but an array of multiple panels is required for mass consumption, such as for a building.

45. Most PV solar energy is "grid-connected," meaning that it is connected to the electric grid. In these instances, an inverter is required to convert DC power from the solar panels to AC power used in the grid. There is a smaller market for "off grid" PV solar power, to power things such as recreational vehicles, electric cars, and emergency telephones.

///

---

[4] CSP is a relatively small part of the solar energy market and is not the subject of this dispute.
[5] Solar panels are also sometimes referred to as solar modules.



Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

**B. Traditional Polysilicon-Based Solar Energy**

46. Traditionally, solar panels are comprised of flat polysilicon-based solar cells constructed into a plane. An array of traditional flat solar panels is shown in Figure A below.



**Figure A**

47. To maximize the direct capture of sunlight, traditional solar panels are often installed on a tilted mounting device, as shown in Figure A above. Further, to maximize efficiency and avoid shadowing, traditional solar panels must be spaced apart across the roof top or installation surface.

48. To maximize collection, stationary traditional solar panels are usually installed in a southward orientation in the Northern Hemisphere and northward in the Southern Hemisphere. However, a traditional solar panel can really maximize collection only if it is installed on a rotating system that allows the panel to track the sun across the sky. Otherwise, the solar panel sacrifices energy collection and efficiency by being stationary. Such rotating systems are typically heavy, require substantial mounting hardware, and are generally not suitable for rooftop applications.

///

///

///

///

49. Traditional panels also face issues with high winds. Because those panels are flat, wind will flow off of one panel to the underneath of the next panel causing lift, as shown in Figure B.




**Figure B**

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

50. To prevent a traditional panel from physically lifting off the roof, the panel must be anchored to the building's roof. Traditional solar panels are anchored with either ballast or through a rooftop mounting system, which penetrates the roof's membrane. Traditional flat solar panels also are subject to heavy down forces as wind presses against their surface.

51. Because traditional solar panels require these mounting specifications, there are often limitations on the types of buildings that can accommodate them. For example, historically protected buildings often do not permit penetration of their roofs. Furthermore, building warranties can be voided and leakage can result from rooftop penetration. Most commercial and industrial buildings are value-engineered, i.e., built with only sufficient load bearing capability as required by local code and environmental conditions. Such buildings typically do not have enough incremental load bearing capacity to allow a traditional flat-panel solar system with its attendant mounting system to be installed. The light weight and wind flow-thru characteristics of the Solyndra panel system were ideal for these value-engineered rooftops.

**C. <u>The Market for Polysilicon</u>**

52. Polysilicon is used as a raw material in a number of technologically advanced industries, such as the semiconductor industry and the solar industry. The polysilicon used in the

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

solar industry must be more highly refined than the polysilicon used in other applications. In 2006, for the first time, more than half of the world's polysilicon supply was used in PV solar panels. Polysilicon is one of the crucial and most expensive components in the manufacture of Defendants' solar panels.

53. During the ITC's investigation, Defendants attempted to evade responsibility for their predatory pricing scheme by claiming that the decline in selling prices was nothing more than the result of declining polysilicon prices, a raw material input.

54. The ITC rejected this argument—finding that the "total costs of raw materials as a unit of net sales increased;" and thus that Defendants could not use the declining price of polysilicon as an explanation for the dumping of solar panels in the United States.

**D. <u>Solyndra's Revolutionary Technology</u>**

55. In the mid-2000s, Solyndra developed an innovative solar PV system: CIGS-based thin film solar cells in a cylindrical shape. By arranging a series of cylindrical modules in a panel with spaces between each module, system arrays could be installed with significantly reduced balance-of-system costs. Both the material used and its shape presented a threat to the traditional and long-dominat flat polysilicon-based panels manufactured and sold by Defendants.

56. Each Solyndra module is made up of concentric cylindrical tubes, the inner tube of which is completely covered with CIGS-based thin film materials and is scribed to create approximately 150 solar cells across the length of the module. The concentric cylindrical tube design allows the module to be filled with a proprietary optical coupling agent ("OCA"), a fluid that has an index of refraction matched with the outer glass. By filling the modules with this OCA, most light which strikes the outer tube is redirected to the photovoltaic material on the surface of the inner tube maximizing the conversion efficiency. The cylindrical module design also incorporates a hermetic seal on each end to create a leak-tight seal, thus isolating the active solar cell materials from moisture and resulting degradation. A diagram of Solyndra's cylindrical module is represented in Figure C.

///

///




**Figure C**

57. Each of Solyndra's solar panels consists of an aluminum frame packed with 40 cylindrical modules of the type described above. One of Solyndra's solar panels is depicted in Figure D below. This size of solar panel allows Solyndra's panel to be easily lifted by two people, thus making installation much easier and less expensive than of a traditional flat panel.



**Figure D**

58. Solyndra's panel installations had numerous advantages over the traditional PV systems manufactured by Defendants, including higher electricity output per rooftop, reduced balance-of-system costs, easier installation, lower weight, minimized rooftop impact, and less maintenance. In addition, Solyndra's tubes:

a. Are able to absorb energy from any direction (direct, diffused, and reflected);



Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

b. Always have some portion of their surface facing towards the sun;

c. Allow wind to blow through the panels; and

d. Allow dirt, snow and other sediments to fall off instead of accumulating.

59. Solyndra's cylindrical design maximizes energy absorption and collection efficiency. Traditional PV panels can only collect sunlight from one side of the panel. Solyndra's panels, consisting of tubes of PV cells, can collect sunlight from 360 degrees of the PV cells.

60. Unlike traditional flat PV panels, Solyndra's cylindrical design also allows for the collection of diffused and reflected light, as shown in Figure E below.




**Figure E**

61. When placed on a light colored reflective roof, Solyndra's panels collect up to 20% more sunlight than traditional flat PV panels.

62. Because traditional PV panels, like those produced by Defendants, are flat, there is a peak collection time depending on the location of the sun in relation to the direction the panels have been mounted. During the rest of the day, traditional solar panels do not collect maximum direct sunlight. Solyndra's design reduces this "off peak" limitation. Indeed, the cylindrical nature of Solyndra's product allows it to collect direct sunlight through most of the day because part of each tube is always facing the sun.

63. The cylindrical nature of Solyndra's product also greatly reduces its wind resistance. Solyndra's panels require no rooftop mounts to withstand winds of up to 130 miles per hour. Unlike a traditional solar panel, a strong wind will not create lift, nor will it add to the functional weight of the building. Instead, wind will pass through the cylinders, as shown in Figure F.

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802




**Figure F**

64. Like with the wind, Solyndra's cylinders also allow for light snow to pass through the solar panels instead of accumulating on top. The snow that accumulates underneath Solyndra's panels actually increases the reflected light that can be absorbed from the CIGS film on the underneath of the cylinder.

65. Dirt, rain, and other airborne particles also fall through the cylinders, preventing build-up that reduces the efficiency of a traditional solar panel. In fact, the energy loss due to soiling of Solyndra's panels is half that of traditional flat solar panels.

66. Solyndra's panels also work best when packed closely together. In contrast to the traditional panels that must be spaced apart across the installation surface to avoid shadowing and to maximize efficiency, Solyndra's panels can produce more electricity per rooftop on an annual basis.

67. Unlike traditional panels with expensive and complex installation, Solyndra's panels can be installed with one-third as much labor, in one-third of the time, for one half of the cost. Because of the lower cost of installation, Solyndra initially charged a price premium of approximately 25% and was competitive on a rooftop installation with the pricing offered by traditional solar panel manufacturers, including Defendants, until Defendants' conspiracy and dumping of solar panels overwhelmed Solyndra. Despite these design advantages and initial price premium, Defendants and their co-conspirators were nonetheless able to drive Solyndra into bankruptcy through their anticompetitive conduct.

68. The light weight and minimally invasive installation system of Solyndra's panels allowed for installation on a wide range of rooftops, including older buildings. For example,

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

Solyndra's solar panels were installed without penetrating the roof. The relative low weight of a Solyndra panel system allowed for installation on many load-constrained commercial and industrial rooftops.

69. In 2010, Solyndra was recognized by the Massachusetts Institute of Technology's TECHNOLOGY REVIEW as one of the "50 Most Innovative Companies in the World." It was also listed by the WALL STREET JOURNAL in its review, "The Next Big Thing: Top 50 Venture Backed Companies."

70. In addition, Solyndra's technology and business model attracted extensive Silicon Valley and global investor support with over $1.2 billion invested. Similarly, after a lengthy loan application process, the federal government lent Solyndra $535 million.

**E. <u>Orders Pour In for Solyndra's Groundbreaking Solar Panels.</u>**

71. The 100 Series was the first type of Solyndra panel to roll off the assembly line. These were first produced in September 2007 and by January 2008, samples were ready for certification. Solyndra 100 Series panels were being shipped from California by April 2008.

72. In July 2010, Solyndra began shipping a new product, the 200 Series. This product had wider spacing of modules, thus increasing the power per module by approximately 11%. The 200 Series panels eliminated the need to ground the modules and were linked together in arrays without screws. The net result was a significant reduction in system installation labor time and cost.

73. Solyndra's panels made a big splash in the market. For example, in 2009, Solyndra sold 30.48 MW of solar panels. In 2010, Solyndra sold 87% more—57.02 MW. Before Defendants' dumping scheme negatively impacted its business, Solyndra had contracted with multiple customers for hundreds of megawatts of sales worth hundreds of millions of dollars.

**<u>Defendants' Conspiracy</u>**

74. Recognizing that they could not keep pace with the innovation presented by Solyndra's technology, Defendants entered into a conspiracy with each other and, pursuant to national and local policies directing commercial growth and dominance in the United States market, with key suppliers and lenders to dump product at predatory levels, and to drive Solyndra and other American solar manufacturers out of business. The success of this plan can be measured by the

sheer number of bankruptcies filed by United States solar manufacturers over the past several years.

75. Solyndra represented the perfect target for Defendants' conspiracy. As an emerging technology start-up company, it had yet to reach its financial potential. And, Defendants' predation and conspiratorial acts ensured Solyndra never would meet that potential.

76. Consistent with national and local five-year plans relating to Defendants' commercial activity, Defendants conspired together and among themselves to engage in predatory pricing and attempted monopolization. Defendants also tortiously interfered with Solyndra's agreements.

77. As demonstrated in the chart below, all three Defendants began dumping products in the United States market ***at the exact same time*** and in markedly parallel form. The timing and remarkable similarity of Defendants' pricing behavior completely belies any claim of independent action.

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802




**Figure G**

78. In those years demonstrated above, each of the three Defendants "coincidentally" cut their prices by 44% to 45%.

79. Defendants had the market power to control prices and restrict output. In fact, Solyndra and other American solar manufacturers had to reduce prices in order to have any hope of surviving against Defendants' monopolist practices. Ultimately, as Defendants continued to illegally dump below-cost product in the United States market, Solyndra and other manufacturers were forced out of the market.

80. In contrast to the American and European companies that were acting independently and competing fairly, Suntech, Trina, and Yingli acted together to dominate the United States commercial and industrial rooftop market and drive Solyndra and other American solar companies out of business.

81. Defendants also acted contrary to rational economic rules. Economic theory dictates that, all else equal, a rational actor in the market will increase prices when demand is increasing in order to maximize his profits.

82. In early 2009 demand in the United States market was expected to increase significantly through 2012, as set forth below.




83. Reality matched these expectations and United States demand for solar panels has almost doubled every year since 2007.

///

///

///



Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802




84. Furthermore, even Defendants themselves expected demand to increase. For example, in June 2009, Suntech's Chief Strategy Officer planned for the United States market to triple in 2010.

85. At a time when demand was rising, and Defendants recognized that demand was rising, Defendants curiously began to slash their prices in an effort to aggressively capture market share and drive competition from the marketplace.

86. Defendants also used their trade association, China New Energy, to fix prices at artificially low rates and to flood the market with an over-supply of polysilicon solar panels. As part of China New Energy's stated goals, Defendants "collaborated" amongst themselves—"We encourage a spirit of cooperation and collective assistance amongst our members."

87. Defendants were able to meet and communicate at regularly-held China New Energy forums. According to China New Energy, it takes its role in providing valuable information about activities in all areas of "new energy" very seriously. For that purpose, regular meetings are held between members' top executives, government officials and others to discuss "cooperation and collaborative efforts between the members." As noted above, the chairmen of Suntech and Trina serve on the board of China New Energy, and Yingli is also a member. Following meetings, prices for solar panels fell and Defendants continued to export more than 95% of their production.

88. Upon information and belief, China New Energy provided a vehicle through which



Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

Defendants "cooperated and collaborated" to develop a pricing and output strategy to dominate the United States market. This trade association was utilized as part of Defendants' overall plan to ensure American solar manufacturers, particularly Solyndra, are driven out of the market.

89. Defendants, two of whom share the same address in the Cayman Islands where they are incorporated, coordinated their below-cost dumping efforts.

90. Each Defendant also demonstrated a common course of dealing and agreement through their exporting 95% or more of their production and flooding the United States market, rather than selling in their own domestic market. This massive level of export simply defies all logic in light of China's huge need not just for energy, but clean energy. According to the United States Energy Information Administration, China leads the world in energy consumption, with its use doubling in just the last decade. Rather than meeting these needs through solar energy or other domestically produced forms of energy, China instead has become the world's second largest importer of oil—preferring to import the energy it needs while dumping products in the United States that could fulfill at least part of its energy demands. Defendants' agreement to a common practice is further demonstrated through the Export Plan to flood the United States market with solar panels and for the co-conspirators to fund those efforts through below-market rate and "extend and pretend" loans (which were ultimately determined to be illegal), and preferential polysilicon pricing (which was also ultimately determined to be illegal).

91. Defendants' actions shocked even the most seasoned analysts studying the industry, who predicted only a fraction of the price declines forced by Defendants' predatory conduct. For example, a leading solar analyst (FBR Capital Markets) observed that "product prices are falling more than expected" in 2009. These predictions were not mere guesswork. Rather, analysts examined regulatory trends, production, and buying patterns. They also interviewed key employees at the selling companies (like Solyndra and other solar companies) and the largest developers of solar projects (such as Phoenix Solar).

92. Consistent with many high-tech industries, leading analysts predicted solar panel prices to decline by approximately 5% per year. Instead, Defendants' conspiracy caused prices to drop precipitously and suddenly. In 2008, prices for solar panels were approximately $3.30 per watt,

but by November 2011, they were down to near $1 per watt, a 70% decrease.

93. In explaining the market to Solyndra, one analyst wrote that Defendants set prices at "irrationally low" levels.

94. Other analysts reached the same conclusion—on August 13, 2009, Barclays Capital explained that Yingli adopted a "strategy of gaining market share at the expense of profitability."

95. Defendants' conspiracy was aided by various other co-conspirators. Through the assistance and cooperation of these companies and organizations, Defendants conspired together to hide the true costs of producing their solar panels, dump their products on the United States market, and drive Solyndra and other American manufacturers out of business.

96. In addition to China New Energy, Defendants' co-conspirators include the China Development Bank, the Export-Import Bank of China, and the Bank of China. The co-conspirators bolstered Defendants' ability to price PV solar panels at a predatory level by providing preferential loans at below-market rates to Defendants.[6] By bearing these costs, the co-conspirators participated in and assisted Defendants with their scheme to illegally dump below-cost solar panels on the United States market.

97. Indeed, the U.S. government has already determined that the U.S. solar energy industry was injured by reason of this loan scheme and Defendants' unlawful dumping.

98. For example, through a scheme known as "extend and pretend" the co-conspirator banks roll over loans from year to year, rather than requiring payment when the loans are due. Suntech, which has nearly $1.6 billion in loans due this year, has banked on the "extend and pretend" scheme, intending to roll over most of its loans until (at least) 2013.[7]

99. The International Herald Tribune reported that in 2010 and 2011, Defendants' co-conspirator the China Development Bank alone extended more than $34 billion in credit to China's

---

[6] These loans by Defendants' co-conspirators were used to fuel the conspiracy. They were allocated consistent with Defendants and their co-conspirators' plan to export more than 95% of their production, and to bear such costs so as to allow Defendants to monopolize the United States market.

[7] For example, a Lazard Capital Markets analysis from June 2009 expressed concern about the size of Yingli's credit facilities, especially those with short-term maturities. It turns out that because of this "extend and pretend" scheme, the analysts did not need to worry because such costs were concealed, and not borne by Defendant Yingli directly.



Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

solar companies. Included among this are $5.3 billion to Defendant Yingli, $7.3 billion to Defendant Suntech, and $4.4 billion to Defendant Trina.

100. Suntech's spokesman Rory Macpherson admitted that Suntech's below-market $7.3 billion line of credit could be used to expand capacity—and thus gain market share in the growing and valuable United States market where its panels were shipped.

101. The Export-Import Bank of China provides seller credits and other financing for products, such as PV solar panels listed on the Government of China's "Catalogue of Chinese High-Tech Products ***for Export***." Consistent with the commercial directives of the Five-Year Plan and Defendants' strategy of exporting more than 95% of their product from China, the Export-Import Bank of China has assisted Defendants in their conspiracy by providing highly concessional financing and below-market interest rates thereby concealing the true costs of Defendants' solar panels.

102. The Export-Import Bank of China participated in Defendants' conspiracy and supported their actions by, for example, entering into various loans for more than $151 million with Yingli, and over $180 million with Trina. Yingli itself admitted that it had received significant financing from Export-Import Bank of China at "below-market" interest rates. And, Trina's Chief Financial Officer, Terry Wang, explained that the loan from Export-Import Bank of China would be used for market expansion, including increasing Trina's market share in the United States.

103. In September 2009, Bank of China, another government owned bank specializing in development of China's foreign trade, entered into agreements with Trina and Suntech to further Defendants' conspiracy to export more than 95% of their production and to sell below costs. These agreements included credit facilities for Trina and Suntech worth $322 million and $436.5 million respectively.

104. While Defendants' financial statements for 2011 demonstrate losses as they illegally dumped product in the United States, the true situation was even worse as there were significant additional costs that were concealed as a result of co-conspirators bearing part of the costs of the conspiracy. Just considering the $4.4 billion of loans that Defendants reported in 2011, if these loans were below-market by just 2%, Defendants were able to under report (and avoid paying)

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

interest expense of more than $89 million during 2011 alone. More importantly, the "extend and pretend" loans, by way of the perpetual deferral of repayment, provided key operating capital that allowed Defendants to sustain irrational operating losses while they dumped their products in the United States.

105. As noted by the Chief Marketing Officer of another leading American solar manufacturer: "The Chinese strategy is very clear. They are engaging in predatory financing, and they're trying to drive everybody else out of the market. When you've got free money[,] you can out-dump everybody below cost."

106. Chinese polysilicon manufacturers, such as GCL-Poly Energy Holdings Limited, Jiangsu Shunda, and Daqo New Energy Corp., also assisted and furthered Defendants' agreement to export more then 95% of their product and to monopolize the market. As noted by Commerce in its March 20, 2012 decision, "[a]ll the producers of polysilicon purchased by [Defendants] . . . are authorities"[8] and as such, participated in and assisted Defendants with the scheme to manufacture solar panels and ship them to the United States market at below-cost prices. This preliminary determination was affirmed and made final on October 10, 2012.

107. For example, to assist Trina in hiding the true costs of producing solar panels and to enable it to dump below-cost products on the United States market, co-conspirator GCL-Poly Energy Holdings Limited and Trina have entered into a below-cost agreement for polysilicon. Following extensive litigation with Defendants, Commerce has already cited these agreements for below-cost polysilicon as part of the illegal conspiracy.

108. Similarly, Jiangsu Shunda, a subsidiary of Shunda Holdings Co. Ltd., and Suntech are in the middle of a 13-year silicon wafer supply agreement. Through this agreement, Jiangsu Shunda is participating in Defendants' conspiracy by providing Suntech polysilicon at below-market prices. Again, the costs of this conspiracy which, in this instance, are being borne by Jiangsu Shunda must be factored into Defendants' total costs.

109. Yingli sources much of its polysilicon from Jiangsu Province's Daqo New Energy Corp. Like with Suntech, Yingli has obtained this polysilicon at below-market prices as a result of

[8] "Authorities" are effectively entities controlled, owned, or managed by the government.

Daqo New Energy Corporation's participation in Defendants' conspiracy to dump below-cost solar panels on the United States market and drive out all American competitors.

110. Defendants and their co-conspirators intended to, and did in fact, monopolize the United States market, drive out the competition through their aggressive export and dumping program, and acquire a monopoly position.

**Threatened by Solyndra's Revolutionary Technology,**

**Chinese Manufacturers Dump Below-Cost Products on the Market**

**A. <u>The Department of Commerce and the International Trade Commission Find Defendants Dumped Solar Panels on the United States Market to the Injury of American Producers</u>**

***1. Background of the Petition***

111. In the fall of 2011, the ITC and Commerce initiated investigations (collectively, the "U.S. Government Action") into allegations that Chinese manufacturers, including Defendants, received illegal subsidies and illegally dumped solar panels on the United States market, which injured United States manufacturers, including Solyndra.[9]

112. Each Defendant voluntarily thrust itself into the U.S. Government Action by requesting to be considered a voluntary respondent, although the proceeding went forward focused on the two largest producers/exports (by aggregate value), Suntech and Trina.[10]

113. All these Defendants provided live testimony on November 8, 2011 before the ITC, with senior executives from all three companies testifying. All three Defendants were represented by lawyers from some of the country's top law firms. The lawyers also submitted briefs and provided oral argument at the hearing in defense of their clients' business practices.

///

///

[9] Under the statutory framework and relevant case law, the ITC determines whether there was injury to U.S. industry and Commerce determines whether dumping or subsidies have occurred. Commerce is also charged with imposing the antidumping or countervailing duty orders.

[10] Yingli requested to be considered as a voluntary respondent, responded to questionnaires, was represented by counsel, and provided live testimony, just like Suntech and Trina.

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

### *2. Commerce Issues Ruling that Defendants Illegally Dumped Products on the United States Market.*

114. Based on its investigation, Commerce found that Defendants and other Chinese manufacturers of solar panels dumped product in the United States market at less than fair value. Commerce assigned to each of Suntech, Trina, and Yingli a weighted average dumping margin of up to 31%. Commerce initially made a preliminary determination of these findings on May 25, 2012. After five additional months of study and analysis, this determination was affirmed and made final on October 10, 2012.

115. "On January 27, 2012, the Department [of Commerce] determined that ***critical circumstances*** exist with respect to imports of solar cells from the PRC for [Defendants], finding that there have been ***massive imports*** of subject merchandise over a relatively short period of time by these entities."

116. Commerce entered an adverse decision against Defendants, finding that: (i) Defendants sold their solar panels in the United States for less than a fair price; and (ii) the United States industry was materially injured as a result.

117. Commerce also determined a "dumping margin"—which is the amount by which the normal value exceeds the export price or constructed export price of the subject merchandise.

118. Commerce imposed weighted average dumping margins to Suntech, Trina, and Yingli of 31.73%, 18.32%, and 25.96% respectfully. Critically, this means that Defendants would have sold their panels in their home market of China (if China were a market economy) for up to 31% ***more*** than the price at which they dumped those panels in the United States market. (While these are significant dumping margins, because China "withheld information and impeded the investigation," the real injury is undoubtedly even more acute.)

119. The trans-Pacific shipping costs of these large and weighty solar panels were not included in Commerce's calculation, making this finding even more profound.

///

///

///

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

### *3. Commerce Finds That Defendants Received Massive Illegal Subsidies*

120. Commerce also determined that massive countervailable subsidies are being illegally provided to Defendants. Specifically, Commerce found that Defendants' costs were being "subsidized" and that the United States market was materially injured as a result thereof. In its final determination, issued October 10, 2012, Commerce determined that illegal subsidies accounted for 14.78%, 15.97%, and 15.24% of Suntech, Trina and Yingli's respective prices.

121. Based on the parties' submissions, Commerce determined, among other things, that Defendants had obtained: (i) polysilicon at less than adequate remuneration, (ii) preferential loans at below-market rates, (iii) land for less than adequate remuneration, and (iv) other countervailable subsidies.

122. The illegal provision of these subsidies has distorted Defendants' financial statements. As one leading analyst explained, Defendants' reported margins are buoyed by subsidized equipment, raw materials, and free loans.

123. When these illegal subsidies are accounted for, as they must be, Defendants' 2011 and 2012 losses are even more dramatic.

124. Finally, the preferential loans received by Defendants were not available to American solar companies. Thus, while the United States has various initiatives for encouraging the solar industry, those programs are available to both domestic and foreign solar manufacturers, including Defendants.[11] Ironically, United States taxpayer dollars that go towards funding solar energy initiatives have been used by Defendants to drive Solyndra and other American companies out of business.

### *4. The ITC Finds that U.S. Industry Has Been Harmed by Defendants' Dumping*

125. In addition to the Commerce findings, on December 16, 2011, the ITC also determined that the solar manufacturing industry in the United States has been materially injured by reason of the subsidized Chinese solar panels that are sold at less than fair value in the United States.

126. After examination of the record, the ITC found that Defendants' products were sold at

[11] As an example, Suntech received millions of dollars from the United States government.



Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

lower prices than the comparable domestic product in 18 of 19 quarterly comparisons.[12]

127. The ITC also noted several instances "where the domestic industry lost sales to low-priced imports." Additionally, the ITC reported that fifteen of the sixteen domestic producers "have reduced their prices of [solar] cells and panels in order to compete with prices of [Chinese] imports since January 2008."

128. The ITC's decision specifically found that the "***pervasive underselling***" by Defendants allowed them "to gain market share at the expense of the domestic industry."

129. Ultimately, the ITC rejected Defendants' arguments that the decline in prices was attributable to the decline in polysilicon prices.[13] Instead, the ITC found that the total cost of raw materials increased, and Defendants' irrationally low prices were the result of unlawful dumping.

130. In addition, the ITC found that the value of imported solar panels from China rose 411.7% from 2008 to 2010, far outpacing the increase in American consumption for that same period.

131. Because of the sales lost to Defendants' predation and the subsequent loss of market share, the ITC found that "there is a reasonable indication that an industry in the United States is materially injured by reason of allegedly dumped and subsidized imports of [solar] cells and panels from China."

132. The validity of the ITC's determination is borne out by sheer number of bankrupt solar companies and shuttered plants. According to the Coalition for American Solar Manufacturing, "At least twelve domestic U.S. manufacturers have shut down plants, declared bankruptcy, or staged significant layoffs since 2010."

133. Solyndra, Energy Conversion Devices, Inc., SpectraWatt, Inc., Evergreen Solar, Inc.,

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

[12] The exact data has been redacted in the publicly available versions of these decisions.

[13] The plunging prices charged by Defendants in the United States market are not attributable to discrepancies in labor costs, either. The National Renewable Energy Laboratory estimates that Chinese producers have an inherent cost advantage of no greater than 1% compared to U.S. producers. This is more than offset by their cost disadvantage of 5% when shipping costs are included. THE NEW YORK TIMES reported that the chief executive of Nature Elements Capital, a Chinese clean energy investment company based in Beijing, attributes the low cost of Chinese products not to inexpensive labor in China, but rather to free or subsidized land from local governments, extensive tax breaks, and other state assistance.

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

and BP Solar are just some of the companies that have become insolvent or shuttered operations in the United States as a result of Defendants' illegal scheme.

134. Evergreen Solar ("Evergreen"), a Massachusetts-based solar power manufacturer, filed for Chapter 11 bankruptcy in August 2011. Executives from Evergreen attributed its demise to the subsidies illegally provided to Chinese competitors, such as Defendants.

135. Abound Solar ("Abound") also filed for Chapter 11 bankruptcy in July 2012. Abound was a producer of cadmium telluride thin film solar products based in Colorado. According to Abound's former chief executive, Abound simply could not compete with the flood of Chinese panels sold below costs.

136. Numerous other American companies and plants have been forced out of the solar market because of Defendants' illegal scheme, as shown in the table below:

| Company | Status |
|---|---|
| Solyndra LLC (California) | Bankrupt |
| Energy Conversion Devices Inc. (Michigan) | Bankrupt |
| SpectraWatt, Inc. (New York) | Bankrupt |
| Evergreen Solar, Inc. (Massachusetts) | Bankrupt |
| Abound Solar (Colorado) | Bankrupt |
| BP Solar (Maryland) | Halted production at Frederick, Maryland plant in Spring 2011 |
| Solon Corporation (Germany) | Closed U.S. facility in Arizona |
| Solar World (Oregon) | Closed California facility |
| Amonix (California) | Closed Nevada facility |

137. American companies, competing fairly, just could not keep pace with plummeting prices set by Defendants as they flooded the American market. Defendants' dumping scheme pushed wholesale solar panel prices down sharply. In fact, in multiple instances, Solyndra lost sales to Defendants who were offering solar panels at uneconomically and irrationally low prices.

138. In October 2010, Solyndra bid on two large scale projects and lost out on both to Yingli's solar panels priced below cost. One, a project at Holyoke Mall in Massachusetts, was estimated to bring in approximately $5 million to Solyndra. But, Solyndra lost out to Yingli's panels which were dumped at a price of approximately $1.60 per watt.

139. Solyndra lost another multi-million dollar opportunity at Cranberry Mall in Pennsylvania in October 2010. Again, Yingli dumped below-cost solar panels at approximately

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

$1.60 per watt. Solyndra simply could not afford to match these prices.

140. As more fully described in paragraphs 161 to 192 below, Solyndra also lost millions of dollars in sales due to Defendants' tortious interference with Solyndra's agreements and business relationships.

141. As the chief marketing officer of a top U.S. manufacturer of solar panels explained, "If something isn't done [about the Chinese predatory practices], no one will be making solar PV in the U.S."

**B. <u>Other Indications that Defendants Sold Below-Cost Solar Panels in the U.S.</u>**

***1. Suntech Admitted to Participating in Defendants' Scheme.***

142. An August 2009 NEW YORK TIMES article reported that Suntech's founder and then-CEO Dr. Shi Zhengrong even admitted to Suntech's participation in Defendants' predatory pricing scheme. Specifically, Dr. Shi confessed that: "***Suntech, to build market share, is selling solar panels on the American market for less than the cost of materials, assembly, and shipping***."

143. Indeed, each Defendant suffered massive losses in 2011 as the scheme reached its zenith. Suntech suffered a net loss of $116 million in 2011, Yingli of $599 million and Trina of $37 million.

***2. Further Evidence Demonstrates Defendants Sold Solar Panels Below Costs.***

144. During the course of Defendants' conspiracy, they consistently sold panels at prices well below costs in order to eliminate Solyndra and other competition and thus gain monopoly power over the market.

145. By early July 2009, Photon Consulting Group, one of the leading solar market analysis and research firms, estimated Yingli's 2009 costs to be at least $2.52 per watt. At the same time, Yingli was selling panels for $1.70 per watt.

146. Likewise, Solyndra calculated Suntech's cost from its reported financials in May 2009 and found Suntech's costs to be at least $2.31 per watt.[14] Solyndra's customers, however, were

[14] Defendants' true costs are further obscured by the number of products and geographic markets into which Defendants sell their panels. Further, costs of co-conspirators are not included in these calculations. In short, defendants "reported" costs are not an accurate reflection of true costs to sell a solar panel in the United States market.

purchasing Suntech panels well below this cost during this time frame.

147. Finally, consistent with the ITC and Commerce findings, Trina suffered massive losses in 2011 as it dumped its product in the United States market at prices below cost. Commerce specifically determined that Trina was underselling in the United States by 18.32%.

148. Solyndra personnel were perplexed at how Defendants were able to report positive gross margins in their earnings reports when costs were this high and prices were this low. In truth, Defendants were hiding much of their true costs through the assistance of their co-conspirators.

149. Third-party analysts like Deutsche Bank observed that Defendants have employed various "accounting tricks" that enabled them to re-allocate their COGS below the pricing line. And there are undoubtedly additional costs which were buried by Defendants.

150. Much the same, industry analysts reported that the margins reported in Defendants' financials were due to subsidized manufacturing equipment and raw materials. In fact, one analyst described the price set by Defendants as "irrationally low."

### C. After Knocking Solyndra and Other American Manufactures Out of Business, Defendants Stand Alone in the U.S. Rooftop Market

151. Defendants' predatory pricing scheme has already paid dividends. They have destroyed a dozen major United States solar manufacturers, including Solyndra. Defendants' share of the United States rooftop market soared to more than 65% by the end of 2011. In fact, with all the recent bankruptcies of U.S. solar manufacturers, Defendants' market share is increasing with each solar manufacturer that is driven out of business.

152. Defendants are already beginning to recoup their investment—as the WALL STREET JOURNAL reported in a September 2012 article "Sun Peaks Through in Solar: Overseas Suppliers ***Trounce U.S. Panel Makers*** but Installations are ***Soaring***": "The solar-power business is expanding quickly in the U.S. . . . . But the growth isn't coming from U.S. solar [panel] manufacturing." Instead, the growth is coming from Chinese-made panels installed in the United States.

153. The demand for solar energy is growing as the world looks for alternatives to fossil fuels and ecologically friendly energy sources. With demand rising, and other potential competitors bankrupt or driven out of business, Defendants will be able to charge monopoly prices and reap

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

monopoly-level profits.

154. As Representative Edward J. Markey, the ranking Democrat on the National Resources Committee explained, "China knows that the global solar market is worth trillions of dollars over the coming decade, and they have developed a sophisticated campaign to dominate this industry."

155. In short, because of the immense amount of support given to Defendants by their co-conspirators, the window for Defendants to recoup their investment is much longer than in a traditional market economy.

156. Defendants' future recoupment will be further guaranteed because of the significant barriers to entry into the solar manufacturing market, as discussed at paragraph 37 above and including the high costs of building a manufacturing plant (nearly $1 billion) of the scale necessary to keep pace with Defendants. By eliminating Solyndra and its proprietary technology that otherwise would have made recoupment difficult, Defendants have moved to ensure they recover their investment.

157. In addition to profiting by running Solyndra and other American manufacturers out of business, Defendants, their executives, and their co-conspirators all stand to benefit by reason of the Chinese non-market economy. For example, Defendants' executives stand to gain significant compensation that is not related to the profitability of the company—Suntech's CEO is often referred to as the world's first "green" billionaire.

158. In addition to driving competitors out of business, and thus harming competition, Defendants' illegal cabal will have wide-ranging and injurious effects on customers. Most importantly, prices for solar panels in the market will ultimately be higher than they would have been but for Defendants' wrongful conduct.

159. Further, without any viable competition, Defendants will be able to cheat on service, warranties, and quality because there will be no viable competitors left to hold Defendants accountable. In fact, the Five-Year Plan recognized that Chinese products face serious quality concerns in the American marketplace.

///

160. Ultimately, the end prices charged to consumers will also not reflect the realities of the market, but rather monopoly prices gained by Defendants' illegal conduct. Defendants are on the verge of completing their plan to dominate the United States solar market and will be in a position to recoup their losses—albeit support from Defendants' co-conspirators lengthens the viable period for recoupment.

**Defendants Tortious Interference Caused Massive Damage to Solyndra**

161. Prior to being driven out of business by Defendants, Solyndra entered into a number of potentially lucrative and substantial customer agreements. These agreements were the subject of lengthy negotiations and built upon a foundation of well-developed business and personal relationships between Solyndra and its customers. For this reason, each agreement was unique and differed with respect to duration, quantity, price, and degree of commitment.

162. At the time these customer agreements were initially entered into, they were carefully drafted to accurately reflect the reasonable expectations of both parties regarding how much they would purchase or sell based upon current and anticipated market conditions. Unfortunately, over time, and as a direct result of Defendant's unlawful conduct, including the predation and interference described herein, market prices eroded faster than Solyndra's customers (and market analysts for that matter) ever imagined they would.

163. Some of the biggest solar integrators, installers, and distributors were customers of Solyndra, including Alwitra GmbH & Co. Klaus Gobel, Carlisle Syntec, Inc., EBITSCHenergietechnik GmbH, GeckoLogic, Phoenix Solar AG, Solar Power, Inc., SunConnex B.V., SunSystems S.p.A., and Umwelt Sonne Energie GmbH. Solyndra's sales personnel spent hundreds of hours, took dozens of international flights, and spent millions in marketing dollars to cultivate these precious and valuable relationships.

164. Solyndra produced and manufactured solar panels for these and other customers in its Fremont, California plant. It suffered injury in California as a result of Defendants' tortious interference.

///

///

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

165. Solyndra's agreements with each of these customers was widely publicized through press releases, newspaper articles, and otherwise in the solar industry trade. In fact, all but three of these customers were specifically identified in Solyndra's S-1 statement, which was publicly filed with the SEC.

166. Each of these customer agreements were not initially terminable at will, but rather had a specified termination date, usually five years after commencement of the agreement. Over time, these agreements were renegotiated in the face of Defendants' wrongful conduct.

167. Specifically, Defendants aggressively and repeatedly interfered with Solyndra's agreements and business relationships, dumping products and cutting prices below costs on a month-to-month basis, defying logic and any normal and reasonable business practice.

168. Due to Defendants' tortious interference, Solyndra lost sales from these customers and others. Indeed, Solyndra's distributor/installer customers were told by Defendants that if they continued to honor their customer agreements to purchase Solyndra's solar panels, other distributors/installers, using Defendants' dumped panels, would undersell them, thereby effectively threatening the customer's existence.

**A. Carlisle**

169. Carlisle Syntec, Inc. ("Carlisle") is a leading manufacturer and installer of roofing systems for commercial customers. Carlisle is headquartered in Carlisle, Pennsylvania.

170. Carlisle entered into an agreement with Solyndra on November 11, 2008, for a period of five years.

///

///

///

///

///

///

///

///

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

171. The following volumes and prices were set forth in the parties' agreement:

| Year | Price (per Wp) ($) | MCV[15] (MW) | ACV[16] (MW) | Total Purchase Volume ($ in millions) |
|---|---|---|---|---|
| 2008 | 3.80 | 0.06 | | 0.23 |
| 2009 | 3.69 | 3.50 | 3.50 | 12.92 |
| 2010 | 3.50 | 15.00 | | 52.50 |
| 2011 | 3.25 | 31.00 | | 100.75 |
| 2012 | 3.04 | 47.00 | | 142.88 |
| TOTAL | | 96.60 | 3.50 | 309.27 |

172. While these volumes were negotiated between the parties to represent their expectations, the parties were to meet at least 60 days prior to the start of the calendar year to determine the Minimum Contract Volume for the following year.

173. The volumes and prices in the above table for 2008 and 2009 were firm commitments, however, and pursuant to the agreement, Carlisle was obligated to purchase approximately 4.1 MW for a total of $13 million. Based on the parties' reasonable expectations as negotiated and as set forth in the agreement, Carlisle was to purchase another 35 MW through August 2011 for a total of $119 million. In other words, Carlisle committed to purchase 39.1 MW for $132 million before Solyndra's business was destroyed.

174. But due to Suntech's disruption and interference, including dumping solar panels at below-cost prices to Carlisle, Solyndra lost sales. Specifically, in 2009, pursuant to the parties' agreement, Solyndra executives met with Carlisle employees to discuss pricing for 2010 and beyond. At this meeting, in the face of Suntech's interference and as a condition of making any further sales, Carlisle pressed Solyndra to sell it solar panels at prices well below those agreed upon.

[15] MCV is the Minimum Contracted Volume, or the specific number of MW of PV panels that Solyndra committed to manufacture and sell to the customer in each year of the agreement and that the customer agreed to purchase in the same calendar year.

[16] ACV is the Additional Contracted Volume, or the maximum number of additional MW (above the MCV) that Solyndra could offer to a customer during a calendar year and that the customer was obligated to purchase (or in some instances, that the customer had the option to purchase).



Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

175. As a result, Solyndra sold Carlisle fewer solar panels and at a lower price than the parties had agreed to. Specifically, as a result of Defendants' tortious interference, Solyndra lost ***over $110 million*** in sales to Carlisle.

**B. GeckoLogic**

176. GeckoLogic GmbH ("GeckoLogic") is a solar integrator based in Wetzlar, Germany that designs and installs solar PV systems for homes, businesses, government facilities, and large commercial buildings. When it signed the agreement with Solyndra in September 2008, GeckoLogic had installed over 1,400 solar PV systems around the world.

177. Pursuant to the terms of the agreement between GeckoLogic and Solyndra, GeckoLogic agreed to purchase the quantities at the prices set forth in the table below:

| Year | Price (per Wp) (€) | MCV (MW) | ACV (MW) | Total Purchase Volume (€ in millions) |
|---|---|---|---|---|
| **2008** | 2.99 | 0.20 | 0.40 | 0.60 |
| **2009** | 2.72 | 5.00 | 2.00 | 13.60 |
| **2010** | 2.48 | 15.00 | 4.00 | 37.20 |
| **2011** | 2.25 | 25.00 | 6.00 | 56.25 |
| **2012** | 2.05 | 36.00 | 8.00 | 73.80 |
| **TOTAL** | | 81.00 | 20.00 | 181.45 |

178. The agreement between GeckoLogic and Solyndra, when it was initially drafted and signed by the parties, did include a "take or pay" clause that required GeckoLogic to pay Solyndra for the balance of any contracted volume that GeckoLogic did not purchase in any calendar year. Over time, and as a result of Defendants' interference, however, GeckoLogic aggressively pressed Solyndra for more favorable pricing terms, forcing Solyndra to lose additional sales and revenue.

179. In summary, prior to Defendants' interference, GeckoLogic was to purchase approximately 36.7 MW for approximately ***$111 million***[17] from 2008 through August 2011.

180. As a direct result of Defendants' interference, GeckoLogic purchased only 1.8 MW

[17] Based on an exchange rate of $1.25 from Euro to U.S. Dollar through the term of the agreement.



Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

for approximately $6.1 million from 2008 through December 2009. And, GeckoLogic did not purchase any Solyndra panels after December 2009.

181. At least as early as August 2009, and despite knowledge of Solyndra's agreement with GeckoLogic, Defendants Suntech, Trina, and Yingli were dumping solar panels at below-cost prices of approximately $2.22 to $2.38 per watt to GeckoLogic. These prices offered by Defendants were scheduled to decline even further in the fourth quarter of 2009.

182. Further, GeckoLogic and Yingli collaborated to further interfere with Solyndra's agreement with GeckoLogic. As part of a Solyndra beta system, GeckoLogic installed Solyndra panels on a rooftop in Germany and a webcam was set up to monitor the performance of the Solyndra panels. At some point after installation of the panels and webcam, the webcam stopped transmitting data back to Solyndra.

183. Solyndra later learned that Yingli had interfered with Solyndra's agreement and installed its panels on GeckoLogic's roof—all of which was kept secret from Solyndra.

184. Thus, as a result of Yingli's interference with a known Solyndra customer, Solyndra lost $105 million in sales with just this customer alone.

**C. <u>Umwelt Sonne Energie GmbH</u>**

185. Umwelt Sonne Energie GmbH ("USE") is a solar integrator based in Holzgerligen, Germany. USE designs, builds and services large scale solar PV systems across the European Union. USE also purchases panels for sale to smaller distributors.

///

///

///

///

///

///

///

///

///

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

186. USE and Solyndra entered into a five year agreement on July 2, 2009. At the time the parties entered into their agreement, they contemplated certain MCV and ACV at set prices through 2013, as set forth in the table below:

| Year | Price (per Wp) (€) | MCV (MW) | ACV (MW) | Total Purchase Volume (€ in millions) |
|---|---|---|---|---|
| 2009 | 2.43 | 3.40 | 1.10 | 8.26 |
| 2010 | 2.25 | 7.0 | 3.0 | 15.75 |
| 2011 | 2.09 | 12.0 | 4.0 | 25.08 |
| 2012 | 1.96 | 19.0 | 5.0 | 37.24 |
| 2013 | 1.89 | 25.0 | 5.0 | 47.25 |
| TOTAL | | 66.4 | 18.1 | 133.58 |

187. The above volume and pricing terms represented Solyndra and USE's commitment to each other. In total, before the Defendants' interference, USE committed to purchase approximately 18.3 MW for $50.7 million between 2009 and 2011.

188. Like with GeckoLogic and Carlisle, due to Yingli and Suntech's disruption and interference, including dumping solar panels at below cost to USE, Solyndra lost sales at the agreed upon prices.

189. Because of Defendants' interference and the changed market conditions as a result of Defendants' dumping, USE purchased only 9.7 MW, or approximately half of the required and contracted-for volume, from 2009 through August 2011, for a total purchase price of approximately $29.2 million.

190. In addition to destroying their business, Defendants' actions cost Solyndra yet another $20+ million in just two years with regards to the USE customer relationship.

191. Solyndra's agreements with other companies differed in quantity, duration, price, and degree of commitment; however, Defendants' interference with these relationships followed a similar pattern. Despite knowledge that Solyndra had entered into agreements with the customer, one or more Defendants approached the customer and offered to sell panels at below-cost prices. In all instances, the customer ended up purchasing fewer panels and at a lower price than it initially

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

expected and agreed to.

192. Defendants' tortious interference disrupted Solyndra's customer relationships and caused Solyndra to incur a substantial expense and burden to fulfill what little it could under the relevant agreements. For example, Defendants' actions disrupted the parties' performance by requiring Solyndra to renegotiate terms, prices, and volumes less favorable than the parties had initially negotiated.

**As a Result of Defendants' Illegal Scheme, Solyndra Was Destroyed.**

193. More than $1.7 billion was invested and loaned to Solyndra. Some of the smartest money from around the world invested more than $1.2 billion in Solyndra, with another $500 million in government loans. Virtually all of this money has been lost as a result of Defendants' illegal conduct described herein—the liquidation of Solyndra is expected to realize less than $100 million.

194. As a result of the unlawful and anticompetitive acts of Defendants as alleged herein, Solyndra suffered losses in excess of $1.5 billion to the value of its business, the equity invested in it, and otherwise.

**COUNT I: CONSPIRACY AND COMBINATION TO FIX PRICES AT PREDATORY LEVELS**

**(For Violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1)**

195. Solyndra repeats and re-alleges the allegations of the proceeding paragraphs as if fully set forth herein.

196. Section 1 of the Sherman Antitrust Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce."

197. Defendants knowingly and intentionally combined and conspired with each other, with the co-conspirators named herein, and with others not yet identified, with the specific intent to fix prices of Defendants' solar panels at predatory prices in the United States market, and for the purposes of destroying fair competition in the United States market. In addition, Defendants combined and conspired together to monopolize the American market through their dumping scheme as described herein.

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

198. In furtherance of Defendants' combination and conspiracy, they collectively agreed to price, offer for sale, and did sell solar panels below cost in the United States market.

199. Defendants' intent in pricing their products below cost was predatory. Defendants dumped below-cost products on the United States market in order to eliminate legitimate competition and to gain monopoly power over the market. Defendants possessed the specific intent to monopolize the United States market, as evidenced by their willingness to take losses in order to gain market share and by their own admissions.

200. Defendants' below-cost price fixing has harmed competition in the United States market for commercial and industrial rooftop solar panels by undercutting other solar panel producers and forcing them into bankruptcy in the past several years.

201. Solyndra was injured in fact by the conspiracy of Defendants and other co-conspirators because, despite superior technology and a growing market for its product, Solyndra was unable to match the unlawful prices offered by Defendants.

202. As a further result of Defendants' conspiracy to offer prices below the true measure of Defendants' costs, Solyndra has declared bankruptcy.

203. Defendants have effectively foreclosed new and potential entrants from entering the market or gaining their naturally competitive market shares. The combination and conspiracy to fix maximum prices in the solar panel market in the United States violates Section 1 of the Sherman Act.

204. Solyndra has suffered an antitrust injury as a direct and proximate result of the combination and conspiracy between Defendants and the co-conspirators, and Defendants therefore are liable for treble damages, costs, and attorneys' fees in an amount to be proved at trial.

**COUNT II: COMBINATION TO FIX PRICES AT PREDATORY LEVELS**

**(For Violation of the Cartwright Act, Cal. Bus. & Prof. Code § 16700 *et seq.*)**

205. Solyndra repeats and re-alleges the allegations of the proceeding paragraphs as if fully set forth herein.

206. California's Cartwright Act prohibits any "combination of capital, skill or acts by two or more persons for" the purpose of restraining trade, including price fixing.

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

207. Defendants knowingly and intentionally combined and conspired with each other, with the co-conspirators named herein, and with others not yet identified, with the specific intent to fix prices of Defendants' solar panels at predatory prices in the United States market for the purposes of destroying fair competition in the United States market. In addition, Defendants combined and conspired together to monopolize the American market through their dumping scheme as described herein.

208. In furtherance of Defendants' combination and conspiracy, they collectively agreed to price, offer for sale, and did sell solar panels below cost in the United States market.

209. Defendants' intent in pricing their products below cost was predatory. Defendants dumped below-cost products on the United States market in order to eliminate legitimate competition and to gain monopoly power over the market. Defendants possessed the specific intent to monopolize the United States market, as evidenced by their willingness to take losses in order to gain market share and by their own admissions.

210. Defendants' below-cost price fixing has harmed competition in the United States market for commercial and industrial rooftop solar panels by undercutting other solar panel producers and forcing them into bankruptcy in the past several years.

211. Solyndra was injured in fact by the conspiracy of Defendants and other co-conspirators because, despite superior technology and a growing market for its product, Solyndra was unable to match the unlawful prices offered by Defendants.

212. As a further result of Defendants' conspiracy to offer prices below the true measure of Defendants' costs, Solyndra has declared bankruptcy.

213. Defendants have effectively foreclosed new and potential entrants from entering the market or gaining their naturally competitive market shares. The combination and conspiracy to fix maximum prices in the solar panel market in the United States violates California's Cartwright Act.

214. Solyndra has suffered an antitrust injury as a direct and proximate result of the combination and conspiracy between Defendants and the co-conspirators, and Defendants therefore are liable for treble damages, costs, and attorneys' fees in an amount to be proved at trial.

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

**COUNT III: PREDATORY PRICING**

**(For Violation of Sections 17043 and 17044 of the California Unfair Practices Act, Cal. Bus. & Prof. Code § 17000 *et seq.*)**

215. Solyndra repeats and re-alleges the allegations of the proceeding paragraphs as if fully set forth herein.

216. California Business and Professions Code § 17043, which is part of California's Unfair Practices Act, prohibits any person engaged in business in California from selling or offering to sell "any article or product at less than the cost thereof to such vendor, or to give away any article or product, for the purpose of injuring competitors or destroying competition."

217. California Business and Professions Code § 17044, which is part of California's Unfair Practices Act, prohibits any person engaged in business in California from selling or using any article or product as a "loss leader," defined in § 17030 as including any article or product sold at less than cost where the "effect is to divert trade from or otherwise injure competition."

218. Defendants are engaged in business in California, and have sold or offered to sell their solar panels at below-cost prices to customers in the United States market for the purposes of injuring Solyndra, destroying fair competition in the market and/or gaining monopoly power.

219. Defendants have sold or offered to sell their solar panels at less than cost with the effect of diverting trade from and/or otherwise injuring competition.

220. Defendants have sold their solar panels as a "loss leader" because they have sold their solar panels at prices less than cost and with the effect of diverting trade from and otherwise injuring Solyndra and other American manufacturers.

221. As a result of Defendants' predatory pricing and sales as a "loss leader," Solyndra lost hundreds of millions in sales, the loss of its entire business, and was forced into bankruptcy.

222. Defendants' predatory pricing of solar panels violates Sections 17043 and 17044 of the California Business and Professions Code.

223. Solyndra has suffered injury to its business as a result of Defendants' sales and offers to sell its solar panels below cost, and Defendants therefore are liable for treble damages, costs, and attorneys' fees in an amount to be proved at trial pursuant to California Business and Professional

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

Code § 17082.

**COUNT IV: TORTIOUS INTERFERENCE WITH EXISTING AGREEMENTS**

224. Solyndra repeats and re-alleges the allegations of the proceeding paragraphs as if fully set forth herein.

225. Solyndra entered into valid, binding agreements with the customers named herein, and others not so named. These agreements were the subject of lengthy negotiations, and the agreements were carefully drafted to accurately reflect the initial expectations of both parties regarding how much they would purchase or sell at the negotiated prices and before Defendants' wrongful interference.

226. The existence of these agreements was known to Defendants. In fact, Solyndra's agreements with each of the customers named herein were known to Defendants and widely publicized through press releases, newspaper articles, and otherwise in the solar industry trade.

227. Defendants intentionally interfered with these agreements through a series of acts designed to pressure Solyndra's customers to breach their agreements with Solyndra. Indeed, Solyndra's distributor/installer customers were told that if they continued to honor their commitments to purchase Solyndra's solar panels, other distributors/installers, using Defendants' dumped panels, would undersell them.

228. Defendants' acts caused an actual breach and/or disruption of the agreements between Solyndra and its customers.

229. Solyndra has suffered economic damages as a direct and proximate result of Defendants' tortious interference, and Defendants are therefore liable for all compensatory and exemplary damages in an amount to be proven at trial.

**COUNT V: TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE**

230. Solyndra repeats and re-alleges the allegations of the proceeding paragraphs as if fully set forth herein.

231. In addition to the customer agreements discussed above, Solyndra had economic relationships with a host of additional wholesalers, installers, distributors, and other potential



Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

purchasers of its products. There was a good probability that Solyndra would realize future economic benefit as a result of these relationships.

232. These business relationships were widely publicized through press releases, newspaper articles and otherwise generally known in the solar industry trade and known to Defendants. Thus, Defendants knew, or should have known, of Solyndra's economically beneficial relationship with the customers named herein.

233. Defendants intentionally interfered with Solyndra's economic relationships through a series of acts designed to disrupt these relationships. Specifically, Defendants offered to sell solar panels at below-cost prices to these actual or likely customers to pressure them to cease doing business with Solyndra.

234. Defendants' acts caused an actual disruption of the economic relationships between Solyndra and these actual or likely customers. As a result of Defendants' actions, Solyndra lost sales, or was forced to match Defendants' below-cost prices, thereby losing money in an effort to retain customers.

235. Solyndra has suffered economic damages as a direct and proximate result of Defendants' tortious interference, and Defendants are therefore liable for all compensatory and exemplary damages in an amount to be proven at trial.

**COUNT VI: CONSPIRACY TO MONOPOLIZE**

**(For Violation of Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2)**

236. Solyndra repeats and re-alleges the allegations of the proceeding paragraphs as if fully set forth herein.

237. Under Section 2 of the Sherman Act "[e]very person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce" is liable.

238. Defendants knowingly and intentionally combined and conspired with each other, with the co-conspirators named herein, and with others not yet identified, with the specific intent to monopolize the commercial and industrial rooftop solar energy market.

239. Defendants did not act as competitors, but rather acted as a combined unit, with their

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

co-conspirators, with the common goal of monopolizing the commercial and industrial rooftop solar energy market.

240. In furtherance of this combination and conspiracy, Defendants, as a combined unit, and their co-conspirators agreed to and did offer solar panels at prices below costs to customers within the United States market and to customers with whom Solyndra had a contractual relationship.

241. Also in furtherance of this combination and conspiracy, Defendants collectively received illegal subsidies from their co-conspirators to further their common goal of monopolizing the commercial and industrial rooftop solar energy market.

242. Also in furtherance of this combination and conspiracy, Defendants collectively engaged in the practice of dumping their solar panels in the commercial and industrial rooftop solar energy market at below normal prices—and indeed, below even costs.

243. Defendants have unlawfully achieved an economically significant degree of combined market power in the solar panel market as a result of their combination and have effectively foreclosed new and potential entrants from entering the market or gaining their naturally competitive market shares.

244. Solyndra was injured in fact by the combination and conspiracy of Defendants and other co-conspirators because, despite superior technology and a growing market for its product, Solyndra was unable to match the unlawful prices Defendants offered to Solyndra's customers. As a consequence, Solyndra lost millions of dollars that it was to receive from various customer agreements, and the entire value of its business.

245. As a further result of Defendants' combination and conspiracy to offer prices below the true measure of Defendants' costs, Solyndra has declared bankruptcy.

246. The combination and conspiracy to monopolize the solar energy market violates Section 2 of the Sherman Act.

247. Solyndra has suffered an antitrust injury as a direct and proximate result of Defendants' and co-conspirators' combination and conspiracy to monopolize the panel market, and Defendants therefore are liable for treble damages, costs, and attorneys' fees in an amount to be

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

proved at trial.

**COUNT VII: COMBINATION TO MONOPOLIZE**

**(For Violation of The Cartwright Act, Cal. Bus. & Prof. Code § 16700 *et seq.*)**

248. Solyndra repeats and re-alleges the allegations of the proceeding paragraphs as if fully set forth herein.

249. California's Cartwright Act prohibits any "combination of capital, skill or acts by two or more persons for" the purpose of restraining trade, including price fixing.

250. Defendants knowingly and intentionally combined and conspired with each other, with the co-conspirators named herein, and with others not yet identified, with the specific intent to monopolize the commercial and industrial rooftop solar energy market.

251. Defendants did not act as competitors, but rather acted as a combined unit, with their co-conspirators, with the common goal of monopolizing the commercial and industrial rooftop solar energy market.

252. In furtherance of this combination and conspiracy, Defendants, as a combined unit, and their co-conspirators agreed to and did offer solar panels at prices below costs to customers within the United States market and to customers with whom Solyndra had a contractual relationship.

253. Also in furtherance of this combination and conspiracy, Defendants collectively received illegal subsidies from their co-conspirators to further their common goal of monopolizing the commercial and industrial rooftop solar energy market.

254. Also in furtherance of this combination and conspiracy, Defendants collectively engaged in the practice of dumping their solar panels in the commercial and industrial rooftop solar energy market at below normal prices—and indeed, below even costs.

255. Defendants have unlawfully achieved an economically significant degree of combined market power in the solar panel market as a result of their combination and have effectively foreclosed new and potential entrants from entering the market or gaining their naturally competitive market shares.

256. Solyndra was injured in fact by the combination and conspiracy of Defendants and

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

other co-conspirators because, despite superior technology and a growing market for its product, Solyndra was unable to match the unlawful prices Defendants offered to Solyndra's customers. As a consequence, Solyndra lost millions of dollars that it was to receive from various customer agreements, and the entire value of its business.

257. As a further result of Defendants' combination and conspiracy to offer prices below the true measure of Defendants' costs, Solyndra has declared bankruptcy.

258. The combination and conspiracy to monopolize the solar energy market violates the Cartwright Act.

259. Solyndra has suffered an antitrust injury as a direct and proximate result of Defendants' and co-conspirators' combination and conspiracy to monopolize the panel market, and Defendants therefore are liable for treble damages, costs, and attorneys' fees in an amount to be proved at trial.

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

**PRAYER FOR RELIEF**

Wherefore, Plaintiff prays that the Court enter judgment as follows:

A That the conduct alleged herein constitutes an unlawful conspiracy and combination to fix prices at predatory levels and to monopolize in violation of the federal Sherman Antitrust Act, 15 U.S.C. §§ 1, 2;

B That the conduct alleged herein constitutes an unlawful combination to fix prices at predatory levels and to monopolize in violation of California's Cartwright Act, Cal. Bus. & Prof. Code § 16700 *et seq.*;

C That the predatory conduct alleged herein constitutes unlawful and/or unfair business practices within the meaning of California's Unfair Practices Act, Cal. Bus. & Prof. Code § 17000 *et seq.*;

D That the conduct alleged herein constitutes unlawful tortious interference with Solyndra's customer agreements and prospective economic advantage in violation of California common law;

E That judgment be entered against Defendants and in favor of Solyndra in an amount not less than $1.5 billion, the exact amount to be proved at trial, for damages, penalties, and other

monetary relief, and all treble damages so applicable;

F That judgment be entered against Defendants and in favor of Solyndra for pre-judgment and post-judgment interest;

G That an order be entered awarding Solyndra its expenses and costs of suit, including reasonable attorneys' fees, to the extent allowed by law;

H That Solyndra be awarded such other and further relief as the Court may deem just and proper.

Dated: October 11, 2012

WINSTON & STRAWN LLP

By: W. Gordon Dobie / sgh

By: Robert B. Pringle / sgh

Attorneys for Plaintiff
SOLYNDRA LLC

WINSTON & STRAWN LLP
W. Gordon Dobie (moving for admission *pro hac vice*)
wdobie@winston.com
William C. O'Neil (moving for admission *pro hac vice*)
woneil@winston.com
Kathryn A.Wendel (moving for admission *pro hac vice*)
kwendel@winston.com
35 West Wacker Drive
Chicago, IL 60601
Telephone: 312-558-5600
Facsimile: 312-558-5700

WINSTON & STRAWN LLP
Robert B. Pringle (SBN: 51365)
rpringle@winston.com
Eric E. Sagerman (SBN: 155496)
esagerman@winston.com
101 California Street
San Francisco, CA 94111-5802
Telephone: 415-591-1000
Facsimile: 415-591-1400

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802

**DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure and Northern District Local Rule 3-2(a), Plaintiff Solyndra LLC hereby demands trial by jury of all issues so triable.

Dated: October 11, 2012

WINSTON & STRAWN LLP

By: W. Gordon Dobie /sjl

By: Robert B. Pringle /sjl

Attorneys for Plaintiff
SOLYNDRA LLC

WINSTON & STRAWN LLP
W. Gordon Dobie (moving for admission *pro hac vice*)
wdobie@winston.com
William C. O'Neil (moving for admission *pro hac vice*)
woneil@winston.com
Kathryn A.Wendel (moving for admission *pro hac vice*)
kwendel@winston.com
35 West Wacker Drive
Chicago, IL 60601
Telephone: 312-558-5600
Facsimile: 312-558-5700

WINSTON & STRAWN LLP
Robert B. Pringle (SBN: 51365)
rpringle@winston.com
Eric E. Sagerman (SBN: 155496)
esagerman@winston.com
101 California Street
San Francisco, CA 94111-5802
Telephone: 415-591-1000
Facsimile: 415-591-1400

Winston & Strawn LLP
101 California Street
San Francisco, CA 94111-5802