1

2                          UNITED STATES DISTRICT COURT

3                     FOR THE NORTHERN DISTRICT OF CALIFORNIA

4                                   OAKLAND DIVISION

5

6   THE SOLYNDRA RESIDUAL TRUST, BY          Case No:  C 12-05272  SBA
    AND THROUGH ITS LIQUIDATING
7   TRUSTEE, R. TODD NEILSON,                **ORDER DENYING DEFENDANTS'
                                             JOINT MOTION TO DISMISS
8               Plaintiff,                   PLAINTIFF'S FIRST AMENDED
                                             COMPLAINT**
9          vs.
                                             Docket 74
10  SUNTECH POWER HOLDINGS CO., LTD.,
    SUNTECH AMERICA, INC., TRINA
11  SOLAR LIMITED, TRINA SOLAR (U.S.),
    INC., YINGLI GREEN ENERGY HOLDING
12  COMPANY LIMITED, YINGLI GREEN
    ENERGY AMERICAS, INC.,
13
                Defendants.
14

15

16         Solyndra LLC ("Solyndra") was a domestic manufacturer of tubular solar panels

17  which declared bankruptcy in late 2011.  The Solyndra Residual Trust, as the assignee of

18  Solyndra's assets, brings this antitrust action alleging that various China-based solar panel

19  manufacturers engaged in a predatory price-fixing conspiracy to drive domestic solar panel

20  manufacturers, including Solyndra, out of business by selling their Chinese-made panels at

21  below-market prices in the United States.  The First Amended Complaint ("FAC"), the

22  operative pleading before the Court, alleges a federal claim under the Sherman Antitrust

23  Act, 15 U.S.C. § 1, and various supplemental state law claims against the following

24  Defendants:  Suntech Power Holdings Co., Ltd.; ("Suntech"); Suntech America, Inc.

25  ("Suntech America"); Trina Solar Limited ("Trina"); Trina Solar (U.S.) Inc. ("Trina U.S.");

26  Yingli Green Energy Holding Company Limited ("Yingli"); and Yingli Green Energy

27  Americas ("Yingli Americas").

28

The parties are presently before the Court on Defendants' Joint Motion to Dismiss Plaintiff's First Amended Complaint.  Dkt. 74.  Having read and considered the papers filed in connection with this matter and being fully informed, the Court hereby DENIES the motion for the reasons set forth below.  The Court, in its discretion, finds this matter suitable for resolution without oral argument.  See Fed. R. Civ. P. 78(b); N.D. Cal. Civ. L.R. 7-1(b).

## I.   BACKGROUND[1]

### A.   THE PARTIES

#### 1.   Plaintiff

Solyndra was a manufacturer of solar panels based in Fremont, California.  FAC ¶ 12, Dkt. 70.  Unlike traditional solar panels, which are comprised of flat polysilicon-based solar cells constructed into a planar surface, Solyndra's panels featured an array of cylindrical tubes covered with a thin film photovoltaic material.  Id. ¶ 13.  A side-by-side comparison of a traditional panel (Fig. A) and Solyndra's panel (Fig. B) is shown below:

 

Fig. A                                      Fig. B

Id. ¶¶ 46, 47.  Solyndra began production in 2007 and shipped its first commercial solar panels in 2008, and thereafter increased its sales volume and revenue every quarter through March 2010.  Id. ¶¶ 13, 71-73.  During its existence, Solyndra sold more than $300 million worth of panels and had over 1,100 employees worldwide.  Id. ¶ 13.

In September 2011, Solyndra filed for chapter 11 bankruptcy protection and eventually ceased operations, allegedly due to Defendants' conspiracy to fix prices at

---

[1] The facts that follow are taken from Plaintiff's FAC, which, for purposes of this motion, the Court accepts as true.

anticompetitive levels in the United States.  Id. ¶¶ 13, 20, 244.   In late 2012, the Bankruptcy Court confirmed a liquidation plan, pursuant to which all of Solyndra's assets, including the claims and causes of action asserted in this lawsuit, were transferred to a liquidating trust created under the Plan, i.e., the Solyndra Residual Trust.  Id. ¶ 13.  R. Todd Neilson is the duly-appointed Liquidating Trustee of the Solyndra Residual Trust.  Id.

### 2.   Defendants

Suntech is the world's largest producer of solar panels, and is managed from its headquarters in China.  Id. ¶ 14.  As of December 31, 2011, Suntech has assets of $4.5 billion, more than $3 billion in revenue, and 17,500 employees.  Id.  Suntech's sales in the United States increased from a negligible amount in 2005 to almost $750 million in 2011.  Id.  Suntech America is a wholly-owned subsidiary of Suntech based in San Francisco, California, and is the alter ego of Suntech.  Id. ¶¶ 14, 15.

Like Suntech, Trina is headquartered in China, and is a leading manufacturer of photovoltaic solar panels.  Id. ¶ 16.  As of December 31, 2011, Suntech had $2.8 billion in assets and $2 billion in revenue.  Id.  In the United States, Trina has increased its sales from $13 million in 2009 to $440 million in 2011, and has correspondingly increased its market share.  Id.  Trina U.S. is a wholly-owned subsidiary of Trina which is based in San Jose, California, and is the alter ego of Trina.  Id. ¶ 17.

Yingli is a leading solar energy company based in China and one of the largest vertically integrated manufacturers of photovoltaic solar panels.  Id. ¶ 18.  As of December 31, 2011, Yingli Solar had $2 billion in assets, more than $2.3 billion in revenues, and over 16,000 employees.  Id.  Like its co-conspirators, Yingli's sales in the United States increased from a negligible amount to $340 million in 2011.  Id.  Yingli Americas is a wholly-owned subsidiary of Yingli International and is based in San Francisco.  Id. ¶ 19. Yingli Americas and Yingli share certain of the same executives and are alter egos of one another.  Id.

According to Plaintiff, the alleged price fixing scheme which led to the demise of Solyndra and numerous other American solar panel manufacturers was perpetrated by

Suntech, Trina and Yingli (all of which are publicly-traded on the New York Stock Exchange), and their respective American alter egos, Suntech America, Trina U.S. and Yingli Americas.  Id. ¶ 1.  Defendants are members of the China New Energy Chamber of Commerce ("China New Energy"), a trade association which has the stated purpose of promoting "collaboration" amongst its members.  Id. ¶ 4.  The chairmen of Suntech and Yingli serve on its board of directors, while the chairman of Yingli serves as a director for China New Energy.  Id. ¶ 87.  Through China New Energy, Defendants were able to meet regularly and develop a coordinated pricing and output strategy aimed at dominating the United States solar panel market.  Id. ¶ 87.

## B.   THE ROOFTOP SOLAR ENERGY MARKET

Defendants export 95% or more of their collective solar panel production to the United States market.  Id. ¶ 100.  These panels are composed of polysilicon-based solar cells arranged in spaced arrays for installation on rooftops and other surfaces to capture sunlight.  Id. ¶¶ 46-47.  The photovoltaic effect converts captured light energy into electricity.  Id. ¶ 42.  These flat panels maximize collection through mounting devices that tilt the panels toward the moving sun.  Id. ¶ 48.  However, this traditional design faces several issues that minimize efficiency and can preclude their use and marketability—for example, wind can both lift the panels and subject them to down forces, thus requiring robust and heavy anchoring; flat panels produce shadow, requiring spacing that limits the usable space of any given installation area; requisite anchoring must penetrate the installation surface, which may not be possible and may violate roofing warranties or load bearing limits for a particular installation site.  Id. ¶¶ 47-51.

In the mid-2000's, Solyndra developed a novel alternative to the traditional flat panel design with the "panels" formed with a series of cylindrical tubes wrapped in a thin solar film.  Id. ¶ 55.  These tubes are arranged in a horizontal pane array, similar to flat panels, but differ significantly in design and weight.  Id. ¶ 57.  Unlike flat panels, the Solyndra tubes are capable of collecting sunlight from 360 degrees without moving, while also allowing air, dirt, and snow to pass through the space between the tubes.  Id. ¶¶ 58-59,

62, 63-65.  Additionally, Solyndra's design is capable of collecting direct, diffused, and reflected light without tilting, and benefits rather than suffers from close placement.  Id. ¶¶ 58, 62, 66.  The Solyndra panels weigh less than traditional flat panels, minimize rooftop impact and have lower maintenance costs.  Id. ¶ 58.  Installation of the panels can be achieved with one-third the labor, in one-third the time, and for one-half the cost of installing flat panels.  Id. ¶ 67.  In short, Solyndra's innovative technology eliminated many of the inefficiencies and complications of flat panel technology, while simultaneously maximizing and increasing sunlight collection, energy absorption, and conversion efficiency.  Id. ¶¶ 56, 59.

Solyndra began production of its panels in September 2007.  Id. ¶ 71.  Initially, Solyndra charged a price premium of approximately 25% but remained competitive with respect to rooftop installations with the pricing offered by traditional solar panel manufacturers.  Id. ¶ 67.  Despite the cost premium, demand for Solyndra's panels was strong.  Id. ¶ 71.  Between 2009 and 2010, Solyndra increased its sales by 87%, and had contracted for sales worth hundreds of millions of dollars.  Id. ¶ 73.  At that time, demand for solar panels in the United States was on the rise, nearly doubling every year since 2007.  Id. ¶ 83.  In early 2009, the United States market was expected to continue to increase significantly over the three years.  Id. ¶ 82.

### C.   DEFENDANTS' CONDUCT AND PRACTICES

Defendants, desiring to dominate the United States market for solar panels, became concerned with the innovation presented by Solyndra's technology.  Id. ¶¶ 74-77.  To that end, Defendants allegedly formed a conspiracy to "dump" (i.e., to price their panels below cost) their solar panels in the United States market.  Id.  To that end, as demand for solar panels was rising, Defendants acted contrary to "rational economic rules" by "slash[ing] their prices in an effort to aggressively capture market share and drive competition from the marketplace."  Id. ¶¶ 81, 85.

Defendants also are alleged to have used China New Energy to fix prices at artificially low rates.  Id. ¶¶ 86, 88.  Each year since founding in 2006, China New Energy

has held an International Forum ("Forum"), at which the chairs of Suntech, Trina and Yingli have been featured speakers.  Id. ¶ 89.  Defendants allegedly used China New Energy's annual International Forum as a means of meeting and communicating with one another and reach agreements to fix and lower prices.  Id. ¶ 89.  After each Forum, prices charged by each of the Defendants fell precipitously.  Id. ¶ 90.  For example, after meeting during the second Forum which held on December 11-12, 2007, Defendants lowered their prices by 40%.  Id. ¶¶ 91-92.  After the third Forum held on November 27-28, 2008, Defendants' solar panel prices fell 18%.  Id. ¶ 94.  Following the fourth Forum on January 20-22, 2010, Defendants' solar panel prices fell another 20%.  Id. ¶¶ 95-96.  Between 2008 and 2011, Defendants reduced their prices by 70%.  Id. ¶ 102.  This pricing behavior "shocked" even seasoned industry analysts, who had predicted price reductions of only 5% per year.  Id. ¶¶ 101-102.

### D.   EFFECTS ON UNITED STATES SOLAR MARKET AND SOLYNDRA

As prices for Chinese solar panels in the United States plummeted, American solar manufacturers could not keep pace.  Id. ¶ 156.  Since 2010, "at least twelve domestic U.S. manufacturers have shut down plants, declared bankruptcy, or staged significant layoffs."  Id. ¶ 151.  In contrast, Defendants now occupy a dominant position in the American solar panel market, and by the end of 2011, controlled 65% of the rooftop solar market.  Id. ¶¶ 40, 172.  Correspondingly, Defendants' net revenues soared, with Suntech's net revenue alone increasing to $3.1 billion in 2011 from $1.6 billion in 2009.  Id. ¶ 173.

Defendants' coordinated pricing strategy also compelled Solyndra to lower their prices on preexisting contracts with several large solar integrators, installers, and distributors.  Id. ¶¶ 186-91; 197-98, 203, 212.  Defendants also threatened Solyndra's customers that if they continued to honor the original agreements with Solyndra, other distributors and installers would buy Defendants' panels to undersell them, "effectively threatening the customers' existence."  Id. ¶ 191.  At least one of Solyndra's customers renegotiated its contract to buy fewer panels for less money and Solyndra panels with Yingli panels.  Id. ¶¶ 201-207.  Taking into account the losses on three of Solyndra's

contracts before and after renegotiation, Solyndra lost $236.4 million as a result of changed market conditions caused by Defendants' coordinated actions.  Id. ¶¶ 196-98, 202-03, 210-12.[2]

### E.   PROCEDURAL HISTORY

On October 11, 2012, Plaintiff filed suit in this Court against Defendants.  The subsequently-filed FAC alleges five claims for relief, styled as follows: (1) Conspiracy and Combination to Dump Product and Fix Prices (for Violation of § 1 of the Sherman Antitrust Act, 15 U.S.C. § 1); (2) Combination to Dump Product and Fix Prices (for Violation of the Cartwright Act, Cal. Bus. & Prof. Code § 16700 et seq.); (3) Predatory Pricing (for Violation of §§ 17043 and 17044 of the California Unfair Practices Act, Cal. Bus. & Prof. Code § 17000 et seq.); (4) Tortious Interference With Existing Agreements; (5) Tortious Interference With Prospective Economic Advantage.  FAC ¶¶ 218-258.

The gravamen of Plaintiff's claims is that Defendants conspired to fix prices and dominate the market for solar panels in the United States by selling their Chinese-made panels at "below cost, non-competitive prices" and thereby driving domestic manufacturers, including Solyndra, from the market.  Id. ¶¶ 1-2.  Plaintiff alleges that these actions were not merely a matter of permissible competitive business behavior, but predatory conduct aided by various co-conspirators.  Id.  Plaintiff prays for judgment not less than $1.5 billion for damages, penalties, other monetary relief, and applicable treble damages.  Id. at 52.

Defendants have filed a joint motion to dismiss the FAC.  Dkt. 74.  They argue that the Sherman Act claim should be dismissed because Plaintiff has failed to allege a plausible

---

[2] The FAC includes a discussion of investigations conducted by the International Trade Commission ("ITC") and Department of Commerce regarding Defendants' trade practices and conduct, as well as the resulting injury to United States manufacturers, including Solyndra.  FAC ¶¶ 124-151.  In its motion to dismiss, Defendants dispute the relevance of this information, and argue the findings of the ITC and Department of Commerce "differ significantly from the metric required by the antitrust laws."  Defs.' Mot. at 3.  A court considering a motion to dismiss may take notice of matters of public record, and materials necessarily relied upon in the pleadings where authenticity is not contested. Lee v. City of Los Angeles, 250 F.3d 668, 669 (9th Cir. 2001).  However, for purposes of the instant motion, consideration of the ITC and Department of Commerce's findings is unnecessary to determine whether Plaintiff's claims survive Defendants' motion to dismiss.

conspiracy, has not suffered any antitrust injury, lacks standing to sue, and has failed to properly plead adequate markets to support its antitrust claim.  Defs.' Mot. at 1-3. Defendants further argue that the Court should dismiss Plaintiff's remaining state law claims, or in the alternative, decline to assert supplemental jurisdiction over them.  Id. at 2. The Court granted the parties' request to file oversized briefs, and the matter is now ripe for adjudication.

## II.   LEGAL STANDARD

Pleadings in federal court actions are governed by Federal Rule of Civil Procedure 8(a)(2), which requires only "a short and plain statement of the claim showing that the pleader is entitled to relief[.]"  A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) "tests the legal sufficiency of a claim."  Navarro v. Block, 250 F.3d 729, 732 (9th Cir. 2001).  A complaint may be dismissed under Rule 12(b)(6) for failure to state a claim if the plaintiff fails to state a cognizable legal theory, or has not alleged sufficient facts to support a cognizable legal theory.  Mendiondo v. Centinela Hosp. Med. Ctr., 521 F.3d 1097, 1104 (9th Cir. 2008).  In deciding a Rule 12(b)(6) motion, courts generally "consider only allegations contained in the pleadings, exhibits attached to the complaint, and matters properly subject to judicial notice."  Swartz v. KPMG LLP, 476 F.3d 756, 763 (9th Cir. 2007).  The court is to "accept all factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party."  Outdoor Media Grp., Inc. v. City of Beaumont, 506 F.3d 895, 899-900 (9th Cir. 2007).

To survive a motion to dismiss for failure to state a claim, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  The allegations made in a complaint must be both "sufficiently detailed to give fair notice to the opposing party of the nature of the claim so that the party may effectively defend against it" and "sufficiently plausible" such that "it is not unfair to require the opposing party to be subjected to the expense of discovery."  Starr v. Baca, 633 F.3d 1191, 1204 (9th Cir. 2011).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  Ashcroft v.

1    Iqbal, 556 U.S. 662, 678 (2009).  Where a complaint or claim is dismissed, "[l]eave to

2    amend should be granted unless the district court determines that the pleading could not

3    possibly be cured by the allegation of other facts."  Knappenberger v. City of Phoenix, 566

4    F.3d 936, 942 (9th Cir. 2009).

5    **III.    DISCUSSION**

6        **A.    SHERMAN ACT**

7            "Section 1 of the Sherman Act proscribes contracts, combinations or conspiracies

8    that unreasonably restrain trade."  Gorlick Distrib. Ctr., LLC v. Car Sound Exhaust Sys.,

9    Inc., 723 F.3d 1019, 1024 (9th Cir. 2013).[3]  Antitrust plaintiffs may prosecute § 1 claims

10   under one of two theories of liability.  First, under the rule of reason, which "is the accepted

11   standard for testing whether a practice restrains trade in violation of § 1," the factfinder

12   "weighs all of the circumstances of a case in deciding whether a restrictive practice should

13   be prohibited as imposing an unreasonable restraint on competition."  Leegin Creative

14   Leather Prods., Inc. v. PSKS, Inc., 551 U.S. 877, 885 (2007) (internal quotations omitted).

15   Second, antitrust plaintiffs can allege that a restraint is illegal per se because it is "so

16   plainly anticompetitive that no elaborate study of the industry is needed to establish their

17   illegality."  Nat'l Soc. of Prof'l Eng'rs v. United States, 435 U.S. 679, 692 (1978).  "Price-

18   fixing agreements between two or more competitors, otherwise known as horizontal price-

19   fixing agreements, fall into the category of arrangements that are per se unlawful."  Texaco,

20   Inc. v. Dagher, 547 U.S. 1, 5 (2006); see Knevelbaard Dairies v. Kraft Foods, Inc., 232

21

22

23

24

25

26

27       [3] The Sherman Act, § 1, prohibits agreements that unreasonably restrain
     competition, while § 2 prohibits monopolization, attempted monopolization, and
28   conspiracies to monopolize.

F.3d 979, 986 (9th Cir. 2000) ("Foremost in the category of per se violations is horizontal price-fixing among competitors.").[4]

To state a claim under § 1 of the Sherman Act, a plaintiff must show:  "(1) that there was a contract, combination, or conspiracy; (2) that the agreement unreasonably restrained trade under either a per se rule of illegality or a rule of reason analysis; and (3) that the restraint affected interstate commerce."  Tanaka v. Univ. of S. Cal., 252 F.3d 1059, 1062 (9th Cir. 2001) (internal quotations and citations omitted).  "In addition to these elements, plaintiffs must also plead (4) that they were harmed by the defendant's anti-competitive contract, combination, or conspiracy, and that this harm flowed from an 'anti-competitive aspect of the practice under scrutiny.'  This fourth element is generally referred to as 'antitrust injury' or 'antitrust standing.'"  Brantley v. NBC Universal, Inc., 675 F.3d 1192, 1197 (9th Cir. 2012) (quoting Atl. Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 334 (1990)).

### 1.   Express Agreement

Defendants first argue that Plaintiff has failed to allege a "plausible" conspiracy "because the [FAC] does not allege *facts* showing any express agreement among Defendants regarding pricing."  Defs.' Mot. at 6.  They further assert that Plaintiff's allegations are conclusory and show nothing more than parallel conduct and the opportunity to collude.  Defs.' Mot. at 8.  These contentions are unavailing.

As an initial matter, "it has long been settled that explicit agreement is *not* a necessary part of a Sherman Act conspiracy."  United States v. General Motors Corp.  384 U.S. 127, 142-43 (1966) (emphasis added).  The Sherman Act proscribes agreements to restrain trade, "whether express or implicit [or] whether by formal agreement or otherwise."

---

[4] "The per se analysis is applied to practices that are presumptively illegal, such as (1) horizontal and vertical price-fixing; (2) horizontal market division; (3) group boycotts and concerted refusals to deal; and (4) tie-in sales."  McGlinchy v. Shell Chem. Co., 845 F.2d 802, 811 (9th Cir. 1988).  "Restraints imposed by agreement between competitors have traditionally been denominated as horizontal restraints, and those imposed by agreement between firms at different levels of distribution as vertical restraints."  Bus. Elecs. Corp. v. Sharp Elecs. Corp., 485 U.S. 717, 730 (1988).

1     <u>California ex rel. Harris v. Safeway, Inc.</u>, 651 F.3d 1118, 1132-33 (9th Cir. 2011).  While

2 conclusory allegations of parallel conduct will not suffice, the pleadings need only allege

3 enough facts "to *suggest* that an agreement was made."  <u>Twombly</u>, 550 U.S. at 556-57

4 (emphasis added).  That is, there must be enough facts presented "to raise a reasonable

5 expectation that discovery will reveal evidence of illegal agreement."  <u>Id.</u> at 556-57.

6       Here, the pleadings specifically allege facts that are more than sufficient to suggest

7 that Defendants reached an agreement to fix prices and flood the American market with

8 their below cost Chinese-made panels for the purpose of stifling competition.  The FAC

9 alleges that Defendants effectively controlled their industry trade organization, China New

10 Energy, and held meetings at its annual Forums to coordinate their market strategy,

11 including the coordinated, drastic lowering of prices to dominate the American market for

12 solar panels.  After each Forum held between 2007 and 2010, Defendants' prices uniformly

13 fell precipitously.  These uniform price decreases were completely unanticipated within the

14 industry, given that it was economically irrational to slash prices so significantly in the face

15 of rising demand.  <u>Id.</u> ¶¶ 81, 101-104, 161-62.  Allegedly as a result of Defendants'

16 predatory and collusive conduct, Solyndra and a host of other American competitors went

17 out of business, while Defendants correspondingly increased their sales and market share in

18 the United States.  <u>Id.</u> ¶¶ 14, 16, 18, 23, 40, 85.  Construing these allegations in a light most

19 favorable to Plaintiff, the Court finds that they are sufficient to present a plausible claim

20 that Defendants formed an agreement to restrain trade.[5]

21

22

23

24

_____

25     [5] Defendants also posit that Plaintiff's claims of conspiratorial conduct are
"implausible" given the "large number of players alleged to have been involved."  Defs.'

26 Mot. at 8.  Plaintiff has identified seven co-conspirators in addition to named Defendants.
Defendants cite no authority for the proposition that this particular number of co-

27 conspirators renders the alleged conspiracy untenable, as a matter of law.  In any event,
given the limited record presented, this issue is not one suitable for resolution at this stage

28 of the litigation.

1

### 2.   Predatory Pricing

Defendants next argue that Plaintiff has failed to allege a "likelihood of recoupment" and "pricing below marginal cost," which they aver are necessary to sustain a predatory pricing claim.  Defs.' Mot. at 10-13.[6]  "In a typical predatory-pricing scheme, the predator reduces the sale price of its product (its output) to below cost, hoping to drive competitors out of business.  Then, with competition vanquished, the predator raises output prices to a supracompetitive level."  Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co., Inc., 549 U.S. 312, 318 (2007).  Because reducing prices to increase sales is the essence of competition, the Supreme Court has "carefully limited" the circumstances under which a plaintiff can bring a Sherman Act § 2 claim based on a claim that prices are "too low."  Pac. Bell Tel. Co. v. Linkline Commc'ns, Inc., 555 U.S. 438, 451 (2009).  "Specifically, to prevail on a predatory pricing claim, a plaintiff must demonstrate that: (1) 'the prices complained of are below an appropriate measure of its rival's costs'; and (2) there is a 'dangerous probability' that the defendant will be able to recoup its 'investment' in below-cost prices."  Id. (quoting Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 222, 224 (1993)).

Predatory pricing claims generally are brought under § 2 of the Sherman Act.  See Weyerhaeuser, 549 U.S. at 318; Brooke Group, 509 U.S. at 222.  Defendants acknowledge as much, but argue that the two-part test articulated in Brooke applies equally to claims under § 1 on the ground that "any conspiracy to lose money helps consumers and competition, unless those losses are later recouped through higher prices."  Defs.' Reply at 3 (alterations omitted).  This contention lacks merit.  Despite Defendants' representations to the contrary, see id. at 2-3, no Supreme Court or Ninth Circuit decision has expressly held as such.  Moreover, Defendants' argument overlooks the critical distinctions between these two sections of the Sherman Act.  "Section 1 applies only to concerted action that restrains

---

[6] Though the pleadings utilize the term "predatory" in relation to Defendants' intentional pricing strategy, Plaintiff styles its Sherman Act claim as one for price-fixing, and not strictly for predatory pricing.  FAC ¶¶ 218-227.

trade.  Section 2, by contrast, covers both concerted and independent action, but only if that action 'monopolize[s],' 15 U.S.C. § 2, or 'threatens actual monopolization,' . . . a category that is narrower than restraint of trade."  Am. Needle, Inc. v. Nat'l Football League, 560 U.S. 183, 190 (2010) (quoting in part Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 767 (1984)) (brackets in original).  "Concerted activity subject to § 1 is judged more sternly than unilateral activity under § 2" because concerted activity inherently is fraught with anticompetitive risk."  Id. at 768-69.[7]

Unlike concerted activity, the harm to competition posed by monopolization or attempted monopolization proscribed by § 2 is not always readily apparent.  Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 458-59 (1993) ("It is sometimes difficult to distinguish robust competition from conduct with long-term anticompetitive effects.").  For that reason, the Supreme Court has "been careful to avoid constructions of § 2 which might chill competition, rather than foster it."  Id.  Thus, a plaintiff bringing a § 2 claim must, *in addition to* showing that the defendant's tactics were "predatory" or "unfair," ultimately demonstrate that the defendant's conduct "actually monopolizes or dangerously threatens to do so."  Id.  There is no such corresponding requirement in § 1, where the focus is on "concerted action."  Am. Needle, 506 U.S. at 190 ("§ 1 prohibits any concerted action 'in restraint of trade or commerce,' even if the action does not 'threate[n] monopolization,'") (brackets in original).  "[B]ecause concerted action is discrete and distinct," there is less danger of chilling competition, since "a limit on such activity leaves untouched a vast amount of business conduct," and, in turn, "less risk of deterring a firm's necessary conduct[.]"  Id.

---

[7] "Certain agreements, such as horizontal price fixing and market allocation, are thought so inherently anticompetitive that each is illegal per se without inquiry into the harm it has actually caused."  Copperweld, 467 U.S. at 780.  Such activity "deprives the marketplace of the independent centers of decisionmaking that competition assumes and demands" and "not only reduces the diverse directions in which economic power is aimed but suddenly increases the economic power moving in one particular direction."  Id. at 769.  Though the combination of resources "may well lead to efficiencies that benefit consumers, . . . their anticompetitive potential is sufficient to warrant scrutiny even in the absence of incipient monopoly."  Id.

In view of the fundamental distinctions between § 1 and § 2 of the Sherman Act, the Court is not persuaded by Defendants' contention that Plaintiff's claim under § 1 of the Sherman Act is subject to dismissal for failing to plead a likelihood of recoupment.  The recoupment requirement derives directly from the Supreme Court's insistence that § 2 claims be supported by a showing of monopolization or the dangerous threat of monopolization.  Brooke Group, 509 U.S. at 232 ("'[t]he success of any predatory scheme depends on maintaining monopoly power for long enough both to recoup the predator's losses and to harvest some additional gain.'") (quoting Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 589 (1986)).  Monopolization or the dangerous threat thereof simply is not pertinent to a claim under § 1.  Western Concrete Structures v. Mitsui & Co., 760 F.2d 1013, 1017 (9th Cir. 1985) (noting that predatory pricing under § 2 "differs from [§] 1, which requires a conspiracy, but does not require monopolizing or attempting to monopolize.").  As such, a defendant's recoupment of losses resulting from its below cost pricing need not be alleged to state a claim under § 1.  See Fricke-Parks Press, Inc. v. Fang, 149 F. Supp. 2d 1175, 1183 (N.D. Cal. 2001) ("[E]lements crucial in monopoly and price discrimination claims are not required for a claim under section 1. Indeed, so long as [plaintiff] can establish that injury to competition has occurred . . . , [plaintiff] need not prove that the underlying objective of the alleged conspiracy between . . . defendants is likely to succeed through ultimate recoupment of . . . defendants' losses . . . .").  To conclude otherwise and find that the two-part test for predatory pricing claims under § 2 applies also to § 1 claims would inappropriately conflate these two sections of the Sherman Act.

Even if Plaintiff were required to plead recoupment, there are sufficient allegations to satisfy such requirement.  Plaintiff alleges that Defendants' collusive pricing led to numerous American solar panel manufacturers, including Solyndra, going out of business,

thereby rendering the market more concentrated and less competitive.  FAC ¶¶ 151-55.[8]
With Defendants' alleged control of the domestic market, they now are alleged to possess
sufficient market power to control prices.  Id. ¶ 40. Plaintiff also has alleged that the each of
the Defendants' sales revenues has increased exponentially as a result of the elimination of
their American competitors.  FAC ¶¶ 14, 16, 18.  Defendants dispute the import of these
allegations, noting that the FAC avers nothing regarding increasing prices or profits.  Defs.'
Mot. at 4.  Perhaps so, but a permissible inference to draw from allegations that
Defendants' revenues increased from a *negligible* amount to collectively well over *a billion
dollars* is that they have, or at least have the dangerous ability, to recoup any losses
resulting from below-cost pricing.

Nor is the Court persuaded by Defendants' ancillary argument that a predatory price
fixing claim must be accompanied by allegations that Defendants priced their products
below the "incremental cost of production (i.e., marginal cost) . . . ."  Defs.' Mot. at 12-13.
The Ninth Circuit has recognized that pricing may be deemed predatory, "even though it is
impossible to establish that it is below either the 'product's' marginal or average variable
cost."  Marsann Co. v. Brammall, Inc., 788 F.2d 611, 613 (9th Cir. 1986).  Indeed, courts
have resisted setting any particular bright-line test with respect to the level of pricing that
qualifies as predatory.  See, e.g., Western Concrete Structures Co. v. Mitsui & Co.
(U.S.A.), 760 F.2d 1013, 1016 (9th Cir. 1985) (holding that predatory pricing underlying a
§ 1 claim "usually" but is not always based on below cost pricing); Transamerica Computer
Co., Inc. v. IBM Corp., 698 F.2d 1377, 1387 (9th Cir. 1983) ("this court has already
recognized that prices exceeding average total cost might nevertheless be predatory in some
circumstances"); William Inglis & Sons Baking Co. v. ITT Continental Baking Co., Inc.,
668 F.2d 1014, 1034 (9th Cir. 1981) (rejecting the "rigid adherence to a particular cost-
based rule" with respect to its "analysis of alleged predatory pricing," holding instead that

---

[8] In their reply, Defendants posit that 65% control of the solar panel market is
insufficient to confer the requisite market power to control prices.  Defs.' Reply at 5.
Defendants cite no authority for this assertion, which, in any event, is not suitable for
resolution on a pleading motion.

"[a] price should be considered predatory if its anticipated benefits depended on its tendency to eliminate competition.").[9]

As for the cases cited by Defendants, they are inapposite.  In <u>Church & Dwight Co., Inc. v. Mayer Laboratories, Inc.</u>, No. C 10-4429 EMC, 2011 WL 1225912, at *9 (N.D. Cal. Apr. 1, 2011), the district court merely observed that "predatory pricing" refers to the "pricing of goods or services at a level with which competitors cannot compete such that pricing itself operates as an exclusionary tool."  Nor did the Ninth Circuit in <u>Cascade Health Solutions v. PeaceHealth</u>, 515 F.3d 883 (9th Cir. 2008), which involved bundled discounting, hold that marginal cost is the definitive measure of determining whether pricing is predatory.  <u>Id.</u> at 909.  In fact, the court recognized that a determination of incremental costs may be difficult to ascertain, and therefore, "average variable cost" may suffice to show predation.  <u>Id.</u>  In any event, neither case states that, at the pleading stage, an allegation of predatory pricing requires factual allegations showing that the defendants engaged in below-marginal cost pricing.  At this stage of the proceedings, Plaintiff's allegation that Defendants priced their product below cost is sufficient to avoid dismissal.

### 3.   Standing

Defendants assert that Plaintiff lacks standing to bring a federal antitrust claim on the ground that Plaintiff has failed to plead a "viable allegation of predatory conduct and harm to competition."  Defs.' Mot. at 15.  To establish antitrust standing, a plaintiff must plead the existence of an antitrust injury; that is, "[an] injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful."  <u>Atl. Richfield Co. v. USA Petroleum Co.</u>, 495 U.S. 328, 334 (1990)  Antitrust injury is comprised of "(1) unlawful conduct, (2) causing an injury to the plaintiff, (3) that flows from that which makes the conduct unlawful, and (4) that is of the type the antitrust laws

---

[9] In the context of a Sherman Act § 1 claim, the Supreme Court has expressly declined to decide "what 'cost' is relevant in such cases."  <u>Matsushita</u>, 475 U.S. at 584 n.8. In dicta, however, the Court has suggested that predatory pricing used to "drive [a competitor] out of the relevant markets" could be shown by "(i) pricing below the level necessary to sell their products, or (ii) pricing below some appropriate measure of cost." <u>Id.</u>

were intended to prevent." Glen Holly Entm't, Inc. v. Tektronix, Inc., 352 F.3d 367, 371 (9th Cir. 2003) (internal quotations and citation omitted).   In addition, the plaintiff must be a participant in the same market as the defendants allegedly responsible for the injury. Id.

Defendants do not specifically address the elements of antitrust injury as set forth in Glen Holly.   Instead, Defendants contend that Plaintiff has failed to demonstrate that they engaged in predatory pricing, and that Solyndra's mere inability to "meet or beat" Defendants' prices is insufficient to establish an antitrust injury. Defs.' Mot. at 15-16.   As discussed above, however, Plaintiff has adequately pleaded that Defendants engaged in predatory pricing, and that such conduct resulted in losses to domestic solar panel manufacturers, including Solyndra.  FAC ¶¶ 143, 149, 156-59.  These allegations are sufficient to show antitrust injury. See Knevelbaard Dairies, 232 F.3d at 988 ("When horizontal price fixing causes . . . sellers to receive less [] than the prices that would prevail in a market free of the unlawful trade restraint, antitrust injury occurs."); Amarel v. Connell, 102 F.3d 1494, 1508 (9th Cir. 1996) ("Losses a competitor suffers as a result of predatory pricing is a form of antitrust injury because 'predatory pricing has the requisite anticompetitive effect' against competitors.").   The pleadings also allege that Defendants' conduct has deprived consumers of technological choices and innovative technology options.  FAC ¶¶ 176-179.  The elimination of "market alternatives" may also be considered a form of antitrust injury. Glen Holly, 352 F.3d at 374 (citing Amerel, 102 F.3d at 1509).

### 4.    Relevant Market

Defendants next contend that Plaintiff has failed to adequately allege a "relevant market."  Defs.' Mot. at  17.  "In order to state a valid claim under the Sherman Act, a plaintiff must allege that the defendant has market power within a 'relevant market.'  That is, the plaintiff must allege both that a 'relevant market' exists and that the defendant has power within that market." Newcal Indus., Inc. v. Ikon Office Solution, 513 F.3d 1038, 1044 (9th Cir. 2008).  A "relevant market" has two dimensions:  the "relevant geographic market" and the "relevant product market." Brown Shoe v. United States, 370 U.S. 294,

325 (1962).  "[A] complaint may be dismissed under Rule 12(b)(6) if the complaint's 'relevant market' definition is facially unsustainable."  Newcal Indus., 513 F.3d at 1045.

As an initial matter, the Court notes that there is Ninth Circuit authority holding that "[w]hen a per se violation such as horizontal price fixing has occurred, there is no need to define a relevant market or to show that the defendants had power within the market." Knevelbaard Dairies, 232 F.3d at 986; accord Big Bear Lodging Ass'n v. Snow Summit, Inc., 182 F.3d 1096, 1101-102 (9th Cir. 1999) (noting that in a per se violation case, the plaintiff need not to identify the relevant market in which the defendants' conduct has had an anticompetitive effect); TV Signal Co. of Aberdeen v. Am. Tel. & Tel., 617 F.2d 1302, 1309 n.8 (8th Cir. 1980) ("No proof of relevant market is required under section 1 [of the Sherman Act] where a per se violation is established.").  Plaintiff alleges that Defendants conspired together to engage in price-fixing.  FAC ¶¶ 20, 74, 86.  Nonetheless, for reasons that are not entirely apparent, Plaintiff's opposition omits mention of these cases, and instead, simply argues that its "relevant market" allegations are sufficient.  Although it is not entirely clear that a relevant market analysis is necessary, the Court, in the absence of briefing to the contrary, addresses the arguments presented in the parties' memoranda.

### a)    *Geographic Market*

A geographic market must "'correspond to the commercial realities' of the industry and be economically significant."  Id. at 336-37.  The relevant market is one "in which the seller operates, and to which the purchaser can practicably turn for suppliers."  Tampa Elec. Co. v. Nashville Coal Co., 365 U.S. 320, 327 (1961).  The FAC expressly alleges that "[t]he relevant geographic market is the United States" where Defendants export 95% of collective solar panel production.  FAC ¶ 33, 100.  Defendants contend that limiting the market to the United States is too narrow because Solyndra admittedly sold its products globally and customers can purchase solar panels from European suppliers.  Defs.' Mot. at 19.  However, in identifying the relevant geographic market, "the threatened foreclosure of competition must be in relation to the market affected."  Tampa Elec., 366 U.S. at 327. Here, the pleadings allege that Defendants treated the United States as "a single and distinct

1  geographic market" which they penetrated through their alter egos.  FAC ¶ 15, 17, 19, 33.

2  Their effect on the United States market is shown by the fact that Defendants sold 95% of

3  their output domestically, where Solyndra and almost a dozen other United States-based

4  solar manufacturers went out of business, allegedly attributable to Defendants' anti-

5  competitive actions.  Id. ¶ 5.  Thus, at the pleading stage, the Court is satisfied that Plaintiff

6  has sufficiently alleged that the United States is the relevant geographical market.

7  **b)    *Product Market***

8         The relevant product market consists of "those products to which consumers will

9  turn, given reasonable variations in price."  Lucas Auto. Eng'g, Inc. v.

10  Bridgestone/Firestone, Inc., 275 F.3d 762, 767 (9th Cir. 2001).  Such a market is

11  "composed of products that have reasonable interchangeability for the purposes for which

12  they are produced."  United States v. E.I. du Pont de Nemours & Co., 351 U.S. 377, 404

13  (1956).  "However, within this broad market, well-defined submarkets may exist which, in

14  themselves, constitute product markets for antitrust purposes."  Brown Shoe Co. v. United

15  States, 370 U.S. 294, 325 (1962).  Among the "'practical indicia' of an economically

16  distinct submarket" are the following: "'industry or public recognition of the submarket as

17  a separate economic entity, the product's peculiar characteristics and uses, unique

18  production facilities, distinct customers, distinct prices, sensitivity to price changes, and

19  specialized vendors.'"  Newcal Indus., 513 F.3d at 1045 (quoting Brown Shoe, 370 U.S. at

20  325).

21         The FAC avers that "[t]he relevant product market consists of the market for the

22  sales or marketing of *commercial and industrial rooftop solar photovoltaic panels to*

23  *commercial and industrial rooftop* solar photovoltaic panel production plants (i.e., sell-

24  side), and the market for the purchase of commercial and industrial rooftop solar

25  photovoltaic panels (i.e., buy-side)."  FAC ¶ 35 (emphasis added).  Defendants complain

26  that Plaintiff has improperly limited the relevant product market to *Solyndra's* own

27  products without providing any factual allegations to justify such a limitation.  Defs.' Mot.

28  at 18.  Not so.  The pleadings allege that commercial and rooftop systems have specific

1   requirements, including high efficiency (due to limited space), low weight, ease of

2   installation, non-invasive mounting and ease of maintenance, which make it a distinct

3   market.  FAC ¶ 36.  Plaintiff further alleges that industry analysts consider the market for

4   commercial and industrial rooftop solar photovoltaic panels as distinct.  Id.  Taking the

5   allegations in the FAC as true and resolving all factual inferences in Plaintiff's favor, the

6   Court finds that Plaintiff's definition of the relevant product market is not facially

7   unsustainable.  See Newcal Indus., 513 F.3d at 1045.

8          **B.   CARTWRIGHT ACT**

9          The Cartwright Act "is California's version of the federal Sherman Act and sets

10  forth California's antitrust laws."  Cellular Plus, Inc. v. Superior Court of San Diego Cnty.,

11  14 Cal.App.4th 1224, 1232 (1993).  "The analysis under California's antitrust law mirrors

12  the analysis under federal law because the Cartwright Act, Cal. Bus. & Prof. Code § 16700

13  et seq., was modeled after the Sherman Act."  Cnty. of Tuolumne v. Sonora Comm. Hosp.,

14  236 F.3d 1148, 1160 (9th Cir. 2001).  As discussed above, Plaintiff has sufficiently stated a

15  claim for violation of the Sherman Act.  For the same reasons, Plaintiff has also sufficiently

16  stated a claim for relief under the Cartwright Act.

17         **C.   UNFAIR PRACTICES ACT**

18         Under California's Unfair Practices Act, it is unlawful for an entity engaged in

19  business within the state to "sell any article or product at less than the cost thereof to such

20  vendor . . . for the purpose of injuring competitors or destroying competition."  Cal. Bus. &

21  Prof. Code § 17043.  The Act also prohibits the sale or use of any article or product as a

22  "loss leader."  Id. § 17044.[10]  In claims brought under these provisions, the plaintiff must

23  demonstrate that the defendant "act[ed] with the purpose, i.e., the desire, of injuring

24  competitors or destroying competition."  Cel-Tech Commc'ns, Inc. v. L.A. Tel. Co., 20

25  Cal. 4th 163, 174-75 (1999).  "[A] generalized understanding or intent that particular

26  _____

27         [10] Section 17030 of the Business and Professions Code defines a "loss leader" as an "article or product sold at less than cost: [¶] (a) Where the purpose is to induce, promote or encourage the purchase of other merchandise; or [¶] (b) Where the effect is a tendency or

28  capacity to mislead or deceive purchasers or prospective purchasers; or [¶] (c) Where the effect is to divert trade from or otherwise injure competitors."

conduct will injure competition is insufficient to state a claim; instead, the violator must act with the specific purpose of injuring its competition." Sybersound Records, Inc. v. UAV Corp., 517 F.3d 1137, 1153-54 (9th Cir. 2008) (quoting Cel-Tech, 20 Cal. 4th at 174-75).

Plaintiff alleges that Defendants sold their products at below-cost for the purpose and effect of destroying competition, and precluding new entrants, such as Solyndra, from successfully entering into the market. FAC ¶¶ 220-23, 241. Further, Plaintiff alleges specific facts in support of this claim. E.g., id. ¶¶ 77, 82-85, 100, 103, 105, 163-67. Defendants nonetheless argue that they could not have intended to harm Solyndra in particular because they allegedly formed their anticompetitive agreement *before* Plaintiff began selling its solar panels. Defs.' Mot. at 21-23. But the Unfair Practices Act does not require a defendant to have the purpose of specifically injuring the *plaintiff* in particular; the conduct is actionable if it harms *competition*. See Bay Guardian Co. v. New Times Media LLC, 187 Cal. App. 4th 438, 459-61 (2010) ("[S]ection 17043 applies to acts of below-cost pricing committed for the purpose of injuring either a single or multiple competitors or destroying competition."); Rheumatology Diagnostics Lab., Inc. v. Aetna, Inc., No. 12-CV-05847-WHO, 2013 WL 5694452, at *19 (N.D. Cal. Oct. 18, 2013) (allegations that defendant acted with the purpose of injury plaintiffs and destroying competition were sufficient to state a claim under the Unfair Practices Act).

Defendants next argue that the Plaintiff's allegations show only that their purpose in selling their solar panels below cost was to gain market share or meeting competitor prices—which does not violate the Unfair Practices Act. Defs.' Mot. at 23. While the Unfair Practices Act does not apply to "vigorous competition" or price reductions aimed at increasing market share, it does apply to below cost pricing directed at harming competition. See Bay Guardian Co., 187 Cal. App. 4th at 456-57. Defendants are alleged to have acted in an economically irrational manner by dramatically reducing prices over a multi-year period notwithstanding increasing demand. FAC ¶ 78. Defendants uniformly employed their price reduction strategy with the goal of harming competition, which, in fact, occurred, as evidenced by the elimination of Solyndra and numerous other American

1  solar panel manufacturers.  Id. ¶ 151.  Construing the allegations in a light most favorable

2  to the Plaintiff, this conduct supports the inference that Defendants desired to destroy

3  competitors in the United States.  Therefore, Plaintiff has sufficiently stated a claim for

4  relief under the Unfair Practices Act.

5          **D.**    **INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE**

6        A claim for intentional interference with prospective economic advantage requires,

7  among other things, that a plaintiff allege that the conduct constituting the interference was

8  unlawful for reasons other than that it interfered with a prospective advantage.  See CRST

9  Van Expedited, Inc. v. Werner Enters., 479 F.3d 1099, 1108 (9th Cir. 2007).  An act is

10  unlawful if it is proscribed by some constitutional, statutory, regulatory, common law, or

11  other determinable legal standard.  Korea Supply Co., 29 Cal. 4th at 1159.

12        The parties disagree as to whether Defendants' alleged conduct qualifies as an

13  unlawful act.  Defs.' Mot. at 20-21; Pl.'s Opp'n at 21-22.  Defendants argue that because

14  their alleged sales of solar panels at low prices did not violate the Sherman Act or the

15  Cartwright Act, Plaintiff has failed to sufficiently plead an independent unlawful act.

16  Defs.' Mot. at 20-21.  However, as discussed above, Plaintiff has sufficiently stated a claim

17  for relief under the Sherman Act and the Cartwright Act.  Defendants' alleged conduct, if

18  ultimately proven, would constitute an independent unlawful act in violation of federal and

19  state laws.  Accordingly, Plaintiff sufficiently states a claim for interference with

20  prospective economic advantage.  See CRST Van Expedited, Inc., 479 F.3d at 1110

21  (finding that a plaintiff's sufficient pleading of a violation of California's Unfair

22  Competition Law constituted an adequate allegation of an independent unlawful act).

23          **E.**    **INTERFERENCE WITH CONTRACTUAL RELATIONS**

24        Under California law, a third party to a contract may be liable in tort for

25  intentionally interfering with the performance of the contract.  Reeves v. Hanlon, 33 Cal.

26  4th 1140, 1148 (2004).  In order to state a claim for intentional interference with

27  contractual relations, a plaintiff must allege: (1) a valid contract between plaintiff and a

28  third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts

designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage.  Id.

With regard to the second element of a claim for interference with contractual relations, Defendants argue that Plaintiff has failed to plead that they had actual notice of Plaintiff's contracts.  Defs.' Mot. at 24 n.19.  Under California law, a cause of action for intentional interference with contractual relations may be stated if it is possible to infer from the facts alleged that the defendant knew of plaintiff's contractual relationships with third parties, even if the defendant does not know the specific identity of the third party.  Sebastian Int'l v. Russolillo, 162 F. Supp. 2d 1198, 1203 (C.D. Cal. 2001).  Here, the pleadings allege that Defendants told Plaintiff's distributors/installers that if they continued to honor their purchase commitments with Plaintiff, they would be undersold by their competitors.  FAC ¶¶ 249-250.  In addition, Plaintiff avers that the identity of Solyndra's customers was a matter of public knowledge.  Id. ¶ 249.  A plausible inference may be drawn from these allegations Defendants had knowledge of Plaintiff's agreements with its customers.

Equally unpersuasive is Defendants' contention that Plaintiff has failed to allege sufficient intentional acts of inducement.  Defs.' Mot. at 24.  More specifically, Defendants assert that merely selling their products "at low prices" is insufficient to constitute inducement.  Id. at 25.  But the FAC does not merely allege that Defendants charged "low prices"; rather, it avers that Defendants sold their products at *below* cost in order to drive American competitors out of business and to control the United States market.  FAC ¶ 1.  Such allegations are sufficient to show intentional acts of inducement.  See Quelimane Co.v. Stewart Title Guar. Co., 19 Cal. 4th 26, 56 (1998) (holding that "intentional interference" includes situations in which "the actor does not act for the purpose of interfering with the contract or desire it but knows that the interference is certain or substantially certain to occur as a result of his action," such as where the interference is "incidental to the actor's independent purpose and desire but known to him to be a necessary consequence of his action.").

1    Finally, Defendants argue that the FAC fails to allege facts demonstrating that there

2    were any contractual breaches, and that Plaintiff's allegations show only that it "voluntarily

3    agreed to modify contract terms."  Defs.' Mot. at 24.  Under California law, an express

4    breach is unnecessary to state a claim for the tort of inducing breach of contract.  Ramona

5    Manor Convalescent Hosp. v. Care Enters., 177 Cal. App. 3d 1120, 1131 (1986).  Rather,

6    liability may be imposed "where the defendant does not literally induce a breach of

7    contract, but makes plaintiff's performance of the contract 'more expensive or

8    burdensome.'"  Id. (quoting Lipman v. Brisbane Elementary Sch. Dist., 55 Cal.2d 224, 232

9    (1961)).

10    Here, Plaintiff alleges that Defendants warned Solyndra's customers that "if they

11    continued to honor their customer agreements to purchase Solyndra's solar panels, other

12    distributors/installers, using Defendants' dumped panels, would undersell them, thereby

13    effectively threatening the customer's existence."  FAC ¶ 191.  Likewise, Plaintiff cites

14    examples of the manner in which Defendants' conduct rendered Solyndra's performance

15    more expensive or burdensome.  For instance, Plaintiff alleges that in 2008 Solyndra

16    entered into an agreement with Carlisle Syntec, Inc. ("Carlisle") which established

17    purchase prices and volume commitments for the next five years.  FAC ¶¶ 193-94.  As a

18    result of Defendants' dumping of solar panels at below-cost prices to Carlisle, Carlisle

19    subsequently demanded that Solyndra reduce the price of its products to "well below" what

20    they had previously agreed upon.  Id. ¶ 197.  These allegations, construed in a light most

21    favorable to Plaintiff, are sufficient to demonstrate that Defendants' conduct rendered

22    Solyndra's performance of its agreement with Carlisle more expensive or burdensome, and

23    that its price modifications were effectively involuntary.

24    //

25    //

26    //

27

28

1

## IV.  <u>CONCLUSION</u>

2  For the reasons stated above,

3  IT IS HEREBY ORDERED THAT:

4  1.  The Defendants' Joint Motion to Dismiss Plaintiff's First Amended

5  Complaint is DENIED.

6  2.  This Order terminates Docket No. 74.

7  IT IS SO ORDERED.

8  Dated: March 31, 2014

9  SAUNDRA BROWN ARMSTRONG
United States District Judge

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28